# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-01964-SCT

*IN THE MATTER OF THE ESTATE OF LELA W.
HOLMES: OLLIE HOLMES-PICKETT, ET AL.*

*v.*

*BERTHA HOLMES-PRICE, AS EXECUTRIX OF
THE LAST WILL AND TESTAMENT OF LELA W.
HOLMES, ET AL.*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/29/2005 |
| TRIAL JUDGE: | HON. WILLIAM JOSEPH LUTZ |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | SORIE S. TARAWALLY |
| | JOHNNY CLYDE PARKER |
| ATTORNEYS FOR APPELLEE: | STANLEY FRANK STATER, III |
| | VERNON H. CHADWICK |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | REVERSED AND REMANDED - 06/07/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., GRAVES AND RANDOLPH, JJ.**

**GRAVES, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1.     Ollie Holmes Pickett and numerous other children and grandchildren of Lela Holmes
(Lela) filed a caveat against probate of Lela's last will and testament on the grounds of undue
influence by Bertha Holmes-Price and lack of testamentary capacity.  After a hearing, the
Madison County Chancery Court found that the will was valid and that it was not a product

of undue influence. Aggrieved, the appellants filed this appeal and assert the following errors, which we quote verbatim:

1. That in its application and analysis of the law to facts, the Court below erred in its conclusion that Bertha Price proved by clear and convincing evidence that she did not unduly influence Mrs. Lela Holmes in procuring the Last Will and Testament of Mrs. Lela Holmes executed on May 20, 2003, six days before Testatrix's death on May 26, 2003.

2. The Chancellor erred in finding that the Will is valid in the face of the renunciation of the signature of one of the attesting witnesses – Reverend Ricky Jenkins.

3. The Chancellor erred in finding Mrs. Lela Holmes was of sound and disposing mind when she purportedly published and signed her Last Will and Testament given that she was emotionally distraught after being given the false information that she was being sued by her children and Lucille Holmes, contestants herein – to take away her property.

4. The Chancellor erred in not attaching any weight to the pecuniary interest that Appellees' witnesses had in the validity of the will.

5. The Chancellor erred in failing to recognize the dominance and domineering influence Bertha Holmes-Price exercised in the drafting of the Power of Attorney, Last Will and Testament and Trusts.

6. The Chancellor erred in failing to recognize that the misrepresentation made by Bertha Holmes-Price to Mrs. Lela Holmes – Testatrix – regarding Mrs. Holmes being sued by her children constituted undue influence.

7. The Court erred in finding that Mrs. Lela Holmes was the initiating party in seeking to change her prior Will and cut off some of the objects of her bounty.

8. The document executed by Testatrix does not reflect Testatrix's expressed intent.

9. The no contest clause of the will should not be given effect because it is against public policy and the rights of each Mississippian to seek redress from the Courts where a matter is in dispute.

Because the presumption of undue influence was not overcome by clear and convincing evidence, we reverse and remand.

**FACTS**

2

¶2.    Lela Holmes (Lela) and her husband, who predeceased her, acquired a substantial amount of property in Madison County during their lifetimes.  **Eight children** were born of the marriage, with three daughters and one son surviving.[1]  The surviving children are: **Ollie Mae Pickett**, **Dorothy Wilkins**, **Ruth Greer**, and **Walter Holmes**.  Lela was preceded in death by the following four children: **Willie Holmes, Jr.**, who was previously married to Lucille and apparently was survived by at least two children; **Mammie Holmes Bennett**, who was survived by thirteen children, including Willie Bell Bennett Phillips; **Eddie Mae Holmes Brown**, who was survived by eight children, including Bertha Holmes-Price (Bertha), Kenneth Holmes, Bobbie Holmes, Sandra Meadors, Jacqueline Williams, Sherman Holmes, Janice Marie Holmes and Laverne Holmes; and **J.D. Holmes**, who had no issue.

¶3.    Lela resided at 1425B Mannsdale Road in Madison.  A granddaughter, Bobbie Holmes, and possibly others, lived in the home with Lela.  As Lela required more and more assistance, Bobbie became a paid caregiver for Lela.  Walter, Kenneth and other family members lived nearby and regularly assisted Lela in various capacities.  A great-granddaughter, Latasha Holmes, often drove Lela to doctors' appointments and the like.  Bertha, who lived in Texas, took control of Lela's business affairs in 2001 and later began handling all of her mail.

*2001 Last Will and Testament*

---

[1]There may have also been a ninth child who died as an infant, but the record is somewhat unclear on this.

¶4.    During the last few years of her life, Lela executed various wills.  On June 20, 2001, with Bertha's assistance, Lela executed a will appointing Bertha executrix, with Walter Holmes as alternate executor, and making the following bequests: Lela's house and two acres to the children of Eddie Mae Holmes Brown, with Bertha in charge of the house, but Laverne and Janice and her children living in the house; 16.8 acres to Ruth Greer; 16.8 acres to Ollie Pickett; 16.8 acres to Dorothy Wilkins; 16.8 acres to Walter Holmes; two acres to Bobbie Holmes; two acres to Bertha; two acres to Kenneth Holmes; two acres to Sandra Meadors; two acres to Jacqueline Williams; two acres to Sharman [sic] Holmes; two acres to great-granddaughter Latasha Holmes; two acres to Lucille Holmes, the former spouse of Lela's deceased son; and two acres to Mammie's children.  The 2001 will further provided that her farming tools and any monies left after funeral expenses, etc., would be divided among Lela's living children.  Bertha downloaded a sample will from the internet and drafted this document for Lela.

¶5.    On June 30, 2001, Lela granted general power of attorney to Walter and Bertha. Bertha downloaded the form for this from the internet and filled in the necessary information for Lela.

*2002 Last Will and Testament*

¶6.    Thereafter, Lela, without Bertha's assistance, employed an attorney to draft a new will revoking the previous will.  On January 10, 2002, Lela properly executed a will which appointed Walter Holmes as executor, with Dorothy Wilkins and Bertha as co-alternate executrixes, and made the following bequests: Lela's house and two acres to her four living

4

children, Ruth Greer, Ollie Pickett, Walter Holmes and Dorothy Wilkins; 16.8 acres each to her four living children; two acres each to Bobbie Holmes and Kenneth Holmes; all remaining real property to her grandchildren, her great-granddaughter Latasha Holmes and her former daughter-in-law Lucille Holmes, to be divided equally; and all money to be divided equally among her four living children.

*2003 Last Will and Testament*

¶7.    Near the end of 2002 or early in 2003, Bertha says that she was called from her home in Texas to assist Lela "so she could change her business." Over the course of the next few months, Bertha made all of the necessary arrangements and assisted Lela in granting Bertha sole power of attorney and then in obtaining and executing a new will. The new power of attorney was executed on March 28, 2003, in the presence of Bertha, Bobbie, the attorney and his secretary, and without the presence of any of Lela's children.

¶8.    On May 20, 2003, with Bertha's assistance, Lela executed a new will appointing Bertha executrix and making the following bequests: the house at 1425A Mannsdale Road and two acres to Kenneth Holmes; one acre to the thirteen living children of Mammie Bell Bennett Phillips, to share and share alike; one acre to three of the living children of Eddie Mae Holmes Brown, namely: Janice Marie Holmes, Laverne Holmes and Sherman Holmes, to share and share alike; two acres to Bobbie Holmes (granddaughter); two acres to Bertha (granddaughter); two acres to Sandra Meadors (granddaughter); two acres to Jacqueline Williams (granddaughter); two acres to great-granddaughter Latasha Holmes; two acres to

5

Ollie Mae Pickett (daughter); two acres to Dorothy Wilkins (daughter); one acre to Walter Holmes (son); and one acre to Ruth Greer (daughter).

¶9. This 2003 will also included the following testamentary trusts: **Lela W. Holmes Trust Number One** - Lela's house and two acres surrounding it to Bertha, in trust, for the benefit of Lela's children and grandchildren living at the time of her death, with anyone living in the house to pay rent at a fair price to be decided upon by the Trustee; **Lela W. Holmes Trust Number Two** - the rest of her estate, including fifty-nine acres of land, to Bertha, as Trustee, for the benefit of: Ruth Greer (daughter), an undivided one-fifth interest; Ollie Mae Pickett (daughter), an undivided one-fifth interest; Walter Holmes (son), an undivided one-fifth interest; Dorothy Wilkins (daughter), an undivided one-fifth interest; and the eight children of deceased daughter Eddie Mae Holmes Brown, a collective undivided one-fifth interest. This 2003 will further included a forfeiture clause.

¶10. Once Lela signed the 2003 will, it was folded, put into a jacket and given to Bertha. Bertha said she took it and put it in a safe deposit box until after Lela's death a few days later on May 26, 2003. Lela was 95 years old. Bertha filed a petition for probate of the 2003 will and issuance of letters testamentary in Madison County Chancery Court. Subsequently, on August 4, 2003, Lela's children and several of her grandchildren filed the Caveat Against Probate of Will, asserting that Lela lacked testamentary capacity when she executed the 2003 will and that it was the product of undue influence. In April 2005, the trial court granted partial summary judgment as to the existence of a confidential relationship between Bertha and Lela, thereby putting the burden of proof on Bertha to prove by clear and convincing

6

evidence that she did not unduly influence Lela. After a bench trial, the chancellor entered an opinion on September 15, 2005, finding that Bertha proved by clear and convincing evidence that she did not unduly influence Lela. The chancellor further found the forfeiture clause contained in the will to be valid and disinherited all of the contestants. Thereafter, appellants perfected this appeal. The contestants/appellants are Lela's four surviving children and her grandchildren by Mammie Holmes Bennett and Willie Holmes, Jr., both deceased. The appellees/proponents of the will are Lela's grandchildren by Eddie Mae Holmes Brown.

## ANALYSIS

¶11. This Court will not disturb a chancellor's findings of fact unless they are manifestly wrong, clearly erroneous, or not supported by substantial credible evidence. *Williams v. Williams*, 843 So. 2d 720 (Miss.2003).

*Testamentary Capacity*

¶12. A determination of testamentary capacity is based on three factors:

> 1. Did the testatrix have the ability at the time of the will to understand and appreciate the effects of her act?
> 2. Did the testatrix have the ability at the time of the will to understand the natural objects or persons to receive her bounty and their relation to her?
> 3. Was the testatrix capable of determining at the time of the will what disposition she desired to make of her property?

*Smith v. Averill*, 722 So. 2d 606, 610 (Miss. 1998)(citing *Gallaspy v. Gallaspy*, 562 So. 2d 74, 77 (Miss. 1990); *Edwards v. Edwards*, 520 So. 2d 1370, 1372 (Miss. 1988)).

7

¶13.	The proponents of the will meet their burden of proof by the offering and receipt of the will into evidence and the record of probate. **Smith,** 722 So. 2d at 610, 611. The proponents make a prima facie case solely on this proof. **Id.** The burden then shifts to the contestants to overcome the prima facie case, but the burden of proof remains with the proponents to show by a preponderance of evidence that the testator had capacity. **Id.**

¶14.	In this case, the proponents made a prima facie case on the issue of Lela's testamentary capacity. Appellants claim that Lela lacked testamentary capacity because she was emotionally distraught after being told that she was being sued by her children and Lucille Holmes to take away her property. The trial court apparently did not make a finding on this issue. However, all of the witnesses testified that Lela had testamentary capacity. Also, the basis for this claim carries more weight in this instance in analyzing undue influence. Therefore, there is not sufficient evidence to establish lack of testamentary capacity.

*Undue Influence*

¶15.	The chancellor found that a confidential relationship existed between Lela and Bertha, and, hence, a presumption of undue influence. We agree.

¶16.	"This Court held that a confidential relationship did not have to be a legal one, but that the relation may be moral, domestic, or personal. . . . The confidential relationship arises when a dominant over-mastering influence controls over a dependent person or trust, justifiably reposed." **Murray v. Laird**, 446 So. 2d 575 (Miss. 1984)(citations omitted).

8

¶17.    Several factors must be considered in determining whether a confidential relationship

exists:

> (1) whether one person has to be taken care of by others, (2) whether one
> person maintains a close relationship with another, (3) whether one person is
> provided transportation and has their medical care provided for by another, (4)
> whether one person maintains joint accounts with another, (5) whether one is
> physically or mentally weak, (6) whether one is of advanced age or poor
> health, and (7) whether there exists a power of attorney between the one and
> another.

*Wright v. Roberts*, 797 So. 2d 992, 998 (Miss. 2001)(citing *In re Estate of Dabney v.*

*Hataway*, 740 So. 2d 915, 919 (Miss. 1999)).

¶18.    As all seven of the applicable factors have been met, we find that a confidential

relationship clearly existed and, therefore, a presumption of undue influence.  With regard

to the presumption of undue influence, this Court has established a three-prong test:

> Thus, our law may be summarized to state that when the circumstances
> give rise to a presumption of undue influence, then the burden of going
> forward with the proof shifts to the grantee/beneficiary to prove by clear and
> convincing evidence of:
> (1) Good faith on the part of the grantee/beneficiary;
> (2) Grantor's full knowledge and deliberation of his actions and their
> consequences; and
> (3) Advice of (a) competent person, (b) disconnected from the grantee
> and (c) devoted wholly to the grantor/testator's interest.

*Murray*, 446 So. 2d at 578.  Subsequently, this Court redefined the third prong of the *Murray*

test because it was being read too strictly.  "We declare that the appropriate third prong of

the test is a requirement that the grantee/beneficiary prove by clear and convincing evidence

that the grantor/testator exhibited independent consent and action." *Mullins v. Ratcliff*, 515

9

So. 2d 1183, 1193 (Miss. 1987). "Independent advice is but one way independent consent and action may be shown." *Id.*

¶19.   This Court has previously found that the testimony of the proponents or interested parties is not sufficient to rebut the presumption of undue influence.

> In those cases where you admittedly have a confidential relations transfer from a dependent to a dominant party, it seems to me that the ultimate test should be something on the order of the following: Excluding the testimony of the grantee, those acting in the grantee's behalf (such as the attorney), and any others who could have a direct or indirect interest in upholding the transfer (such as grantee's family), is there any other substantial evidence, either from the circumstances, or from a totally disinterested witness from which the court can conclude that the transfer instrument represented the true, untampered, genuine interest of the grantor?  If the answer to this question is yes, then it becomes a question of fact whether or not there was undue influence.  If the answer is no, then as a matter of law the transfer is voidable.

*Pallatin v. Jones*, 638 So. 2d 493, 495(Miss. 1994)(citing *Vega v. Estate of Mullen*, 583 So. 2d 1259, 1275 (Miss. 1991)(Hawkins, P.J., dissenting on *reh'g*)).

¶20.   This Court reiterated that finding in *Irving v. Phillips*, 827 So. 2d 673, 680 (Miss. 2002).  In *Irving*, an elderly man, with no children or living brothers or sisters, changed his will to leave the residue of his estate to his attorney, Irving.  Irving did not prepare the will in question, but made an appointment for Smith with another attorney, dropped Smith off at the attorney's office and later picked him up.  In analyzing the undue influence factors, this Court found that "the cases cited above say that evidence to rebut the presumption must come from another source" besides Irving and the other attorney.  This Court affirmed the chancellor's finding that the presumption of undue influence had not been rebutted.  This

10

Court also found that, under the applicable precedent, "all that is required to overcome the secrecy issue is to show that the witnesses knew that a will was being executed." *Id.*

¶21. Clearly, there are no disinterested witnesses or other evidence here to reflect Lela's intent to change her will, create two trusts and exclude thirteen grandchildren and Lucille. With the exception of the two witnesses to the execution of the will, all of the other witnesses called to testify at trial, i.e., Bertha, Bertha's brother Kenneth, Bertha's sister Bobbie, the attorney, the attorney's secretary and a local real estate developer, who was going to be developing the property, have an interest in the will.

¶22. As stated previously, Rev. Jenkins, who was Lela's pastor and had known her for some nineteen years, testified that he did not know he was witnessing the execution of Lela's will until later in the process and acknowledged that he felt "tricked." Subsequently, he expressed his opinion that Bertha was wrong. Rev. Jenkins further testified that Lela told him before her death that her children "thought she was crazy, trying to sue her for her land. . . . They thought she was out of her mind." Also, he said her state of mind at the time was "disturbed" at the time she told him. He also acknowledged that he did not have any way of knowing whether Lela was confused or whether she was suffering under mental duress or force.

¶23. The other witness, Mack Arthur Williamson, testified that he had met Lela through Bertha's mother, knew Bertha and her siblings, and had developed a friendship with Lela

11

over some twenty to twenty-five years.[2] Williamson testified that he would stop by to see Lela on and off and that he had visited with her in the spring of 2003 and she asked him to witness her will.

¶24. Neither one of these witnesses offered any evidence of Lela's intent or any evidence to rebut the presumption of undue influence. The testimony of the remainder of the witnesses at trial is insufficient to rebut the presumption because they were all interested parties, and the trial court erred in relying only on this testimony. However, portions of this testimony are included to demonstrate that it would be insufficient even if the witnesses were not interested parties.

*1. Did Bertha prove by clear and convincing evidence that she exercised good faith?*

¶25. This Court has held that the following five factors should be considered in determining questions of good faith:

> (a) the determination of the identity of the initiating party in seeking preparation of the instrument, (b) the place of the execution of the instrument and in whose presence, (c) what consideration and fee were paid, if any, and (d) by whom paid, and (e) the secrecy or openness given the execution of an instrument.

*Murray*, 446 So. 2d at 579. *See also Mullins*, 515 So. 2d at 1195.

---

[2]Interestingly, although Kenneth, Bertha's brother, testified that he has lived at or near Lela's house throughout his life, often visiting her two or three times throughout each day, he also testified that he had never seen Williamson before.

¶26. The evidence contained in the record in this case fails to clearly establish that Lela was "the initiating party in seeking preparation" of a new will. However, there is clear evidence that Bertha played a major role in initiating the preparation of the will.

¶27. The record indicates that Bertha contacted the attorney and scheduled the appointment, Bertha communicated all of the reasons for the appointment to the attorney's office, and Bertha provided all of the specific provisions for the will and the trust. The initial appointment with the attorney was cancelled because Bertha was not going to be in Mississippi at the time and, therefore, would not have been able to meet with the attorney. When the appointment was rescheduled, Bertha traveled from Texas to Mississippi, then drove Lela to the attorney's office and participated in the meeting. Further, although the attorney did testify that he met with Lela privately, he said "the goal was to have her granddaughter, Bertha Holmes, as her power of attorney." Further:

> Q    When you say the goal - -
> A    At least that's the way I understand it.
> Q    Excuse me one second. Is this what Mrs. Lela Holmes told you when
>      y'all went into the private - -
> A    Well, that is right. And that is exactly right. That is why I wanted to
>      meet with her privately. I wanted to talk to her privately about the
>      implications of what it meant to give a power of attorney to somebody.
>      . . .

¶28. There is evidence that Lela may have wanted a new power of attorney. There is some evidence that Lela may have been interested in a trust, as discussed more fully herein, but there is also evidence that the idea of a trust may have come from the developer. However,

13

there is not clear and convincing evidence that Lela was the "initiating party in seeking preparation" of the will.

¶29. The second factor is the place of execution and those present. The will was executed in a conference room at the attorney's office in the presence of the attorney, his secretary and two witnesses, one of whom was unaware of why he was there as discussed more fully herein. However, the record further establishes that Bertha, Bobbie, Kenneth and Walter[3] were present in the attorney's office, but were not in the conference room while the will was being signed. The developer also testified that he was present at the attorney's office on the day Lela executed the will.

¶30. Factors (c) and (d) involve the consideration or fee paid and by whom paid. The record indicates that the attorney was paid by Bertha and her siblings. Bertha made an initial $2,000 payment to the attorney. The attorney's billing statement reflects that he met with "Bertha and Lela Holmes and Bertha's brother about land transactions" for thirty minutes on March 7, 2003, and billed $75 for professional services. On March 19, 2003, the attorney credited the $2,000 payment from Bertha "for POA, Will and land transactions." However, on a later invoice for "Ms. Bertha Holmes-Price," there is the following notation: "4/1/03 Payment of $2,000.00 transferred to Lela Holmes Trust Fund. Payment was not to be used as a Retainer fee as posted on 3/19/03."

---

[3]There was testimony that Walter came to the attorney's office and asked to see Lela, but was not allowed to do so. There was also testimony that Lela had indicated on May 17th that Walter could go with her to do the will.

14

¶31.    The record indicates that Bertha decided that each person who was going to receive land from Lela should pay $1,000 each to be used for expenses in surveying the land, preparing the deeds, etc.  Further, only Bertha and her siblings made contributions.  The attorney set up a trust account for this money and then drew money out of the account to cover his expenses.  The attorney further testified that all of his fees were paid by the proponents of the will and came out of the trust fund, for which he was the trustee.  The attorney testified that, in his view, the money in the account was not estate funds and belonged to the people who contributed it, i.e., the proponents of the will.

¶32.    The record clearly establishes that Bertha and other proponents of the will paid the legal fees involved in the preparation and drafting of the new will and that the attorney arguably had a fiduciary relationship with the proponents of the will stemming from the trust account.  Further, all of the attorney's billing statements referred to Bertha.

¶33.    The last factor involves the secrecy or openness given the execution of the instrument. In her March 11th email, Bertha provided specific instructions to the attorney regarding notification of Lela's heirs.  Bertha's email stated that Lela wanted the attorney to send out certified letters to her four living children and two of her grandchildren, Bertha and Kenneth, notifying them of a meeting at the attorney's office on May 15.  Bertha's email stated that the purpose of the meeting was for Lela to let her children know what she decided to do with the property and that she was "also planning to sign all documents at that time."  Bertha listed by name the parties to be notified of the meeting on May 15.

15

¶34. Then, Bertha stated that "[t]he next thing we will need to do is to send a separate certified [. . .] to the people she will be deeding land to" and listed by name the parties to be notified of a separate meeting on the following day, May 16. The email instructed that the following parties be notified of the May 16th meeting: Lela's four living children, Bertha, Kenneth, Bobbie Holmes, Sandra Meadors, Jacqueline Williams, Latasha Holmes and Lucille Holmes. In the email, Bertha instructed the attorney to annotate the appointment times for both meetings and reiterated that only the listed people in each letter need to show up for the respective meetings. Bertha subsequently faxed the attorney another letter, which is discussed more fully herein, wherein she changed the purpose of the meeting and included the statement that "[u]ntil we know where the children are coming from, we need to be as broad as possible."

¶35. The attorney testified that the family members present at the meeting on May 15th were informed that Lela wanted Bertha to handle her business and saw a brief presentation by the developer. However, the meeting became acrimonious because family members disagreed with Bertha's involvement and then dispersed without any specifics as to what Lela wanted in her will being revealed to the family.[4]

¶36. The Reverend Ricky Jenkins testified that he felt that he was tricked into witnessing the execution of the will by either Bertha or Bobbie and that he did not realize what was

---

[4]Bertha acknowledged in her testimony that Walter arrived late for this meeting and scolded the others for leaving Lela sitting out front in the waiting area by herself while the family members were in the back discussing her property.

going on until later. Rev. Jenkins also testified that he was not able to speak with Lela prior to the execution of the will about why she wanted him there and that Walter came to the attorney's office and asked to see Lela, but was not allowed to do so.

¶37. Lela's previous power of attorney had appointed Walter Lee Holmes and Bertha as Lela's co-attorneys-in-fact. Neither Walter nor any of Lela's other children or grandchildren, except Bertha, were notified that the previous power of attorney had been revoked and/or that Lela had executed a new power of attorney.

¶38. The different letters to various people about different meetings on different days about different aspects of Lela's estate and the manner in which at least one of the witnesses was obtained certainly indicates a level of secrecy or the intent to keep certain information from some individuals.

*2. Did Bertha prove by clear and convincing evidence that Lela had full knowledge and deliberation of her actions and their consequences?*

¶39. This Court has held that the following factors should be considered in determining the grantor/testator's knowledge at the time of execution of the instrument:

> (a) his awareness of his total assets and their general value, (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether non-relative beneficiaries would be excluded or included and, (d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on him and how susceptible to his influence.
>
> The guidelines of our prior cases suggest that the testator/grantor should give a thoughtful deliberation to all of these factors. No set amount of time is stated as required, but a positive factor to overcome the undue influence

17

presumption is a mature and thoughtful weighing of the legal consequences of a grantor/testator's action.

*Murray*, 446 So. 2d at 579. *See also Mullins*, 515 So. 2d at 1195.

¶40. The record fails to prove that Lela was aware of her total assets and their general value as required by factor (a). Further, Bertha admitted this during the following testimony:

> Q      Do you know if she knew what she was worth?
> A      No. I don't know if she knew what she was worth.
> Q      If she did, she never shared it with you?
> A      No, she didn't.

Additionally, there is no definitive evidence in the record as to the value of the property. The appellants assert that the estate is worth some $10-20 million. Whereas, Bertha, as administrator of the estate, filed an inventory determining that Lela's assets, including the 89.5 acres of land in Madison County, totaled a mere $105,861.99, which is virtually impossible. Although there was testimony that Lela may have known her property was valuable, there is no testimony that Lela knew the general value. There is a big difference in knowing something is valuable and knowing what it is worth. Something could be valuable at $100,000, but worth millions. Additionally, Bertha had been handling Lela's business since at least June 2001 and Bertha testified that she didn't know the general value of Lela's assets. The record clearly fails to establish that Lela was aware of the general value of her total assets.

¶41. The second factor requires that Lela had an understanding of the persons who would be the natural inheritors of her bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural

18

distribution. There is nothing in the record to establish that Lela knew the natural inheritors of her bounty at the time she executed the new will or how the changes would affect her prior will.

¶42. Bertha provided the attorney with the names of the heirs who would take under the will and the trust. Bertha neglected to mention that Lela had other deceased children, including one who had thirteen living children. The attorney testified that: "As I recall, I mentioned to her that if she didn't have a will that it would go by decent [sic] and distribution to her children and descendents [sic] of her deceased children." However, the attorney also testified that he was not even aware of these other natural inheritors until he received a letter from them dated May 6, 2003. The record indicates that no revisions were made to Lela's will after May 6, 2003.

¶43. Further, Bertha did not provide the attorney with the 2002 will that Lela had executed, but rather, Bertha provided the attorney with the 2001 will which had effectively been revoked by the 2002 will. Subsequently, Bertha provided the attorney with a second copy of the 2001 will, containing Bertha's handwritten revisions. There is no evidence the attorney discussed with Lela how the changes would affect her prior will. Moreover, it defies logic to suggest that the attorney could have explained how the changes would have affected Lela's prior will when there is no evidence that he even had the only prior valid will.

¶44. The third factor considers whether non-relative beneficiaries would be excluded or included. Bertha testified repeatedly that Lela wanted to deed some land to her former daughter-in-law, Lucille. This is consistent with Lela's two prior wills and with the fact that

19

Lucille was included in the letter that was sent out to those receiving land from Lela. However, Lucille was ultimately excluded from the will. Bertha testified that Lucille was excluded because she wanted more land than Lela was going to give her. However, such a claim is not consistent with other evidence in the record.

¶45. Bertha also testified that Lucille was excluded because she was part of "The Club," i.e., those relatives who were suing Lela because they did not like the way she was disposing of her property, and because she didn't pay the $1,000. Bertha testified that, despite it being factually untrue, she told Lela she was being sued by her children, grandchildren and Lucille, and that Lela believed she was being sued up until her death. Further, there was the following incident:

> Q    Did that event – did the events I just described take place? Did you ever put Mrs. Lela in a car and take her over to Walter's house?
> A    I sure did.
> Q    For what purpose?
> A    I took her over there and showed her that Walter was having a meeting discussing that she didn't own that property.
> Q    All right. Mrs. Lela did believe they were meeting about her property; right?
> A    She did.
> Q    Did either of you get out or go in the house?
> A    No.
> Q    How did you know they were meeting about her property?
> A    Street talk.
> Q    So, it's not possible they were meeting just for a family gathering?
> A    (No audible response.)

¶46. The last factor in determining Lela's full knowledge and deliberation is knowledge of who controls her finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on her and how susceptible to her influence.

¶47. Bertha had power of attorney and was in full control of Lela's finances. Lela was unable to take care of herself and employed Bobbie as a live-in sitter from approximately July 1, 2002, until Lela's death in May of 2003. Various testimony in the record establishes that, except on the rare occasion when Lela would obtain something on her own from the refrigerator or would manage to dress herself, Lela relied on Bobbie, Bertha and others to prepare her meals, dress her, drive her, handle her finances, etc. Further, Bobbie testified that Lela's mail was put up and then given or mailed to Bertha. The attorney testified that Lela was "well aware" that Bertha controlled her finances.

¶48. Bertha testified that she has a bachelor's degree in sociology, a master's degree in social work, and is employed as a social worker at a veteran's hospital. Additionally, Bertha served eleven years in the military and then went into the reserves, retiring with the rank of major. There was testimony that Lela had been a strong-willed, independent woman throughout her life. However, there was also testimony that, at least during the last several months of her life, Lela was frail, needed assistance with everyday activities, walked with a cane, was upset, perplexed, looking for help, was very distraught over some recent family events, etc. These events were the alleged fighting among some family members and that she believed she was being sued by some of her children, grandchildren and former daughter-in-law.

¶49. The evidence contained in the record clearly indicates that Bertha controlled Lela's finances and business, that Lela was very dependent on Bertha and her siblings, and that Lela would likely be very susceptible to Bertha's influence.

21

*3. Did Bertha prove by clear and convincing evidence that Lela exhibited independent consent and action?*

¶50. Bertha offered self-serving testimony that Lela wanted to change her will because of fighting among some family members in December of 2002. Bertha testified that there was one incident in which Walter and Kenneth got into a fight when Walter got upset that Kenneth took a car he was purchasing from Lela without the title being transferred. Bertha testified that Lela, with the assistance of other relatives, then called Bertha and said "she wanted to change her business" and that she "was going to go and put it into a trust." Bertha further testified that she came to Mississippi at Lela's request to help Lela "change her business," and that the following week Dorothy and Walter got into a fight for reasons not made clear and the police were called to the house.

¶51. Bertha testified that Lela reiterated her desire to change her business and wanted to see an attorney. However, Bertha stated that before she saw an attorney, Lela wanted to see a local real estate developer, who had lived next door to Lela and her family for many years.[5] Bertha testified that she took Lela to meet with the developer in February, which was some two months after Lela first conveyed her desire to change her will:

> And she went down there and she explained to [the developer] the same thing I just told you about her children fighting and that she didn't believe that they could hold on to the property and that she was concerned about her son, particularly, about him fighting and that she couldn't even get her own money out of the bank.

---

[5]Bertha testified that she did not know the developer.

The developer did testify that Lela said she was interested in creating a "development trust for the benefit of the heirs so that it would not be sold and all the lease proceeds would go to those heirs." However, Bertha's remaining testimony stated above is contradicted by the developer's testimony that Lela never expressed any concern about the behavior of her family and that she wanted to make provisions that would benefit her entire family.

¶52. As to the discontent of the family members at the family meeting, the developer testified that he had only heard from Bertha that "some of the heirs were not pleased with her representing the family and the structuring of the trust." Also:

Q    Did anyone ever tell you she was distressed over the fact that she was being sued by some of her heirs?
A    [Bertha] availed me of that situation.
Q    Again, [Bertha] was the only one who told you that?
A    Yes, sir.

¶53. The developer further described Lela as "capable and determined." However, he said Bertha, who was present during the meetings, did most of the talking. Further, he acknowledged that, as the land developer, he stood to make a lot of money, contingent on the will.

¶54. The developer referred Bertha and Lela to an attorney, who Bertha testified had previously represented Lela on an eminent domain matter.[6] Bertha contacted the attorney

---

[6]Again, Bertha testified that she did not know the attorney. Further, the attorney testified that his "recollection is that either she or some other members of the family had been clients of ours in the past. I can't really recall what all we did in the past, but that was, of course, one of the reasons why I saw her. . . . I just – it came to my attention, in some fashion, that we had done work for members of the family in the past. . . . So, on that date, I can't say for sure that I recall seeing her in the past, although, maybe I did. I just can't remember right now."

and apparently scheduled an appointment for Lela to meet with the attorney on February 28, 2003. In anticipation of this meeting, Bertha communicated via email and telephone the reasons Lela needed to see the attorney.

¶55. In a February 27 email, Bertha states that Lela wanted to deed some of her land for residential property and that she was considering "possibly letting [the developer] develop the others." Bertha lists Lela's four living children and states that Lela has one deceased daughter (Bertha's mother), but fails to mention Lela's three other deceased children. The email indicates that "[Lela] will need to redo her will to include any other land/personal property, etc., that is not covered in the above scenari[o]." Bertha further states in the email that she "will have all the particulars when I see you all [. . .] tomorrow" and that she "will bring you a copy of [Lela's] current will and power of attorney." However, this appointment was cancelled because Bertha was not going to be able to be in Mississippi to be present at the meeting.

¶56. The appointment was rescheduled for March 7, 2003. Bertha testified that she returned to Mississippi and drove Lela to the attorney's office. Lela, Bertha and Bertha's brother Kenneth, who Lela identified as "my other son Kenny" rather than as her grandson, met with the attorney. According to Bertha, Lela told the attorney she wanted to create a trust and that her children said they would come home if she gave them her land. Bertha testified that the attorney also met alone with Lela for approximately thirty minutes. However, this is contradicted by both the attorney's testimony and his billing statement which indicate the entire meeting lasted only thirty minutes.

24

¶57.   Bertha later testified that when she, Kenneth and Lela were meeting with the attorney, Lela "was talking about deeding land to different people."  Further, Bertha testified that it was decided she should write "things down and communicate with" the attorney "so it won't be no [sic] misunderstanding with anybody."  The attorney testified that he asked Bertha to "put in writing, for me, what it was that she understood that [Lela] wanted."

¶58.   Bertha sent the attorney a follow-up email on March 11, "[p]er our office visit on March 7, 2003, regarding my grandmother. . . ."  Bertha's email, which has portions of the right margin cut off, stated that Lela wanted to establish a trust fund to support herself for the remainder of her life and that she then wanted the remaining money disbursed to "her heirs on a monthly basis.  (I understand you also manage trust funds [. . .] you can send me some information on how this process works, I would appreciate it.[sic]"  Bertha stated that she would be in Mississippi on March 28, that she would have contacted a surveyor and established the trust fund by then, and that "[w]e can meet [. . .] that time and discuss any particulars that need our attentions."  The remaining contents of this email are discussed more fully herein under other factors.

¶59.   As stated previously, Bertha conveyed instructions to the attorney for mailing letters to the heirs regarding a meeting on May 15 and/or 16.  Bertha subsequently faxed a letter containing an agenda for this meeting.  That letter states, in part:

> [The secretary], **I need** to make sure [the attorney] gets this agenda.  **As I told you** on yesterday, **I would like** [the attorney] to meet with Mrs. Lela Holmes' living children (Ruth Greer, Ollie Holmes Pickett, Dorothy Holmes-Wilkins, and Walter Lee Holmes), Kenneth Holmes and me prior to them meeting with

Mrs. Lela Holmes on May 15, 2003 at 09:00 AM. I am faxing you a document **I plan to provide** them.

(1) The Primary purpose of this meeting is to determine if they are participants with the Bennett family (Willie Bell Bennett Phillips) in protesting Mrs. Lela Holmes' Will/Trust. **I have** two versions of this document. One of the versions will be condensed and the other is what I am sending you. **The goal of the letter is mostly to cause shame to her children for not helping with her**. **I will let them know** if they do anything to further hurt their mother, **I will expose them** for who they really are. If the children acts [sic] civilized and cooperate with their mother, **I will not discuss** why Mrs. Lela Holmes wants to put the property in a trust. **Majority of this family does not have the finances to fight what she wants to do, and it is my belief they will get the money and go about their business**.

(2) There are documents regarding the land that these children have in their possession where **all eight (8) children to include (Mammie Holmes Bennett and Willie Holmes Jr. (both deceased) quick deeded the land to their mother during the time period 1977-1980**. Again in 1994 or 1996 her five living children (Ruth Greer, Eddie Mae Holmes, Ollie Pickett, Walter Holmes and Dorothy Wilkins) signed another document putting them back on the deeds with their mother, but only five (5) of the children's names on [sic] are on this document. Mrs. Lela Holmes had hired [deceased attorney] to handle some of these transactions, but I have not been able to get this document. I will work on this when I come home on May 15, 2003.

(3) **Until we know** where they children are coming from, **we need** to be as broad as possible.

. . .

Bertha's various correspondence certainly appears to be pursuant to her own personal agenda with the cooperation of the attorney's office. Further, the portion above with regard to all eight children "quick deeding" the land to Lela certainly supports the repeated testimony that Lela wanted the land to benefit her entire family.

¶60. The record shows that, while he was representing Lela, the attorney did some legal work for Bertha. Bertha discussed setting up a trust for herself and her siblings with the

26

attorney's office in April and also had the attorney draft a release for her husband.[7]  Further,

the attorney sent one or more drafts of Lela's will to Bertha in Texas for her to review.[8]

However, there is no evidence that the attorney sent any drafts of Lela's will to Lela.

On  May 6, Bertha sent the following email to the attorney's office:

Molly, I think we got it straight now.
As you know we are trying to get some of the land deeded out, but in the event something happens, I know we need to put this statement in the will:

"In the event of my death, if the land that I designated to be deeded to Ruth Greer (1) acre, Ollie Holmes Pickett (2) acres, Walter Holmes (1) acres [sic], Dorothy Wilkins (2) acres, Lucille Holmes (2) acres, Bobbie Holmes (2) acres, Bertha Holmes-Price (2) acres, Kenneth Holmes (2) acres and the house he currently resides in at 1425A Mannsdale Road, Madison, Mississippi 39110, Sandra Holmes Meadors (2) acres, Jacqueline Holmes Williams (2) acres, and Latasha Holmes (2) acres has not been deeded out, I devised [sic] and bequeath that such land be deeded out according to my prior wishes and intent.

Forgive me, but it just came to me that Mrs. Lela Holmes has another house on her property.  She has verbally given this house to her grandson, Kenneth Holmes, and he has been living there for over 20 years.  I know we need to make sure this house is covered in this will and to make sure there are no confusions [sic] regarding this house.  It can be worded as follows:

"I have an additional house on my property where Kenneth Holmes resides. Kenneth Holmes has lived in the house for over 20 years and he remodeled the house.  I want it known that I devised [sic] and bequeath that Kenneth Holmes is given this house at 1425A Mannsdale, Madison, Mississippi 39110."

I think once we make these changes, the document will be complete.

---

[7]This email also referenced an April 7 meeting Bertha was having with the attorney and requested that he videotape the meeting.

[8]The attorney also sent drafts of the power of attorney to Bertha for her to review.

27

¶61. Interestingly, the attorney's billing statements indicate that no revisions were made to Lela's will after May 6, the date of the above email. Even more interesting is that at the meeting on May 15, Lela stated that she had not decided anything.

¶62. Bertha testified that she instructed the attorney to remove Mammie's thirteen children from the trust for the following reason:

> My grandmother told me that Mammie's children had already – Mammie had already benefitted from her mother, meaning my grandmother's mother. Mammie was raised by my grandmother, Maloney Webster. And she said that Mammie's husband had messed up the money that she had received from her momma.

However, this rationale makes no sense. Not only did that circumstance exist prior to Lela providing for these thirteen grandchildren in her previous two wills, including the 2002 will where they took equal to Bertha, but there is no rational reason Lela would somehow punish her grandchildren for how a deceased relative allegedly "messed up the money." Additionally, there was various testimony indicating that there had never really been any assets to speak of in the family until this property, so any previous inheritance was likely not much. Further, if Lela had known the general value of her assets, she would surely have realized her estate was sufficient to provide for all of her natural heirs. While provisions do not have to make sense to be valid, we must also point out that, other than Bertha's self-serving testimony, there is absolutely no evidence in the record that Lela intended to exclude these thirteen grandchildren from the trust.

¶63. Bertha gave the instruction to remove Mammie's children at the same time she instructed the attorney to remove Lucille from the will. Bertha then testified that the

28

attorney's secretary called Lela to verify whether she indeed wanted to remove Lucille from the will. However, that claim was contradicted by the secretary's testimony that she had never spoken with Lela on the phone. As stated previously, Bertha also told Lela that she was being sued by her children, some grandchildren and Lucille, based on a letter. The letter, dated May 6, is clearly addressed to the attorney, Lela, Lela's four children and Lucille, and is signed by Willie Bell Bennett Phillips as family representative for the heirs of Mammie Holmes Bennett. There is nothing in the letter to indicate that Lela was being sued by either her children or Lucille.

¶64. The record in this matter clearly indicates that Lela never intended to exclude Lucille or her thirteen other grandchildren. The developer testified that Lela said she did not want her property sold "[a]nd that she wanted all her heirs to benefit. And that's Mrs. Holmes speaking, Lela Holmes herself. A lady of few words, but she spoke very clearly." Moreover, there is absolutely no evidence that Lela intended to create two trusts, one, with possible income of a few hundred dollars a month to benefit all of her heirs, and a second trust, with a huge amount of possible income to benefit only Lela's four living children, Bertha and Bertha's siblings.

¶65. When asked whether he and Lela came to an agreement after the first meeting as to whether he would represent her, the attorney testified that after such a "short meeting" he was not satisfied "that she understood the nature and consequences of her actions and that this is what she wanted to do and not what somebody else wanted her to do." To help ease his concerns, the attorney asked *Bertha* to write up a list of questions, with the corresponding

answers, "of key things that I can ask her that would help me satisfy myself that she is fully understanding the nature and consequences of her actions and of sound mind and fully capable of making decisions on her own." The attorney acknowledged that "[t]his was a lot of people involved. A lot of names, a lot of addresses, a lot of telephone numbers and a lot of property and a lot of separate transactions."[9] As a result, he said he encouraged as much information from Bertha as he could get.

¶66. The attorney also relied on the observations and findings of the developer as to Lela's testamentary capacity and/or whether she was being unduly influenced. The attorney testified that Lela had sufficient mental capacity and that she was not under any undue influence from Bertha based on his communications with Lela, Bertha and the developer. There is no evidence that the attorney sought any input from any outside or uninterested parties.

¶67. Bertha testified that the attorney met privately with Lela "[p]robably five, six, seven times." However, Bertha's claim is totally contradicted by all other evidence in the record. The attorney testified that he met with Lela privately on March 7, which was the day of the initial consultation, on May 20, which was the day of the execution of the will, and that he may have met with her on March 28th, which was the date the power of attorney was executed, but he couldn't recall specifically. As stated herein, the private meeting on March

---

[9]The attorney also testified that: "I'm sure that these, that she didn't come up with that on her own. She probably had to talk to [the developer], to some extent, about that sort of thing, and others too, for that matter."

30

7 and the possible meeting on March 28 involved only the power of attorney. The record indicates that the only time the attorney discussed the will and/or trust privately with Lela was on May 20. However, the attorney's billing statements indicate he spent several hours conferencing with Bertha on the will/trust, including an hour on May 19, the day before it was executed.

¶68. Although the attorney testified that he confirmed with Lela the information that Bertha provided to him, there is nothing in the record to establish that he ever met with or talked to Lela privately about the will until the day it was executed. Further, the record indicates that the will was completed according to Bertha's specifications on May 6, prior to Lela announcing on May 15 that she had not decided anything. Bertha lived in Texas. Lela lived in Madison County, Mississippi. The attorney was located in Madison County. There is no explanation in the record as to why all correspondence between Lela and her attorney first had to travel through Texas and Bertha to arrive back in Madison County. Further, the record is completely lacking of any correspondence between Lela and Bertha and/or Lela and the attorney.

¶69. The attorney testified that Lela had difficulty signing the various pages of the will. "[T]his was physically a little chore for her, but I asked her to sign each page of the will." "By the end of this, this was physically an ordeal for her to have to do this. But, I was absolutely insistent that she bear with us and do it because I wanted to make sure that there was never any question that every page that was in this document had her signature on it. . . ." Also, Lela got assistance as to where she was supposed to sign from the secretary. The

trial court took notice of the degradation of Lela's signature through the course of the document.

¶70. As set out previously, one of the ways to show independent consent and action is to apply the former standard and establish that the testator obtained independent advice of a competent person disconnected from the grantee and devoted wholly to the testator's interest. Such is not the case here. Lela's attorney had previously represented members of her family, but couldn't remember who or on what, and simultaneously undertook legal work for Bertha. There is no evidence that the attorney even offered any independent advice based on the applicable factors. However, there is overwhelming evidence that he communicated almost exclusively with Bertha and that Bertha provided all of the specifics for the will/trust.

¶71. Moreover, testimony from interested witnesses indicating they saw no undue influence is hardly persuasive. This Court has found:

> It follows, from the very nature of the thing, that evidence to show undue influence must be largely, in effect, circumstantial. It is an intangible thing, which only in the rarest instances is susceptible of what may be termed direct or positive proof. The difficulty is also enhanced by the fact, universally recognized, that he who seeks to use undue influence does so in privacy. He seldom uses brute force or open threats to terrorize his intended victim, and if he does he is careful that no witnesses are about to take note of and testify to the fact. He observes, too, the same precautions if he seeks by cajolery, flattery, or other methods to obtain power and control over the will of another, and direct it improperly to the accomplishment of the purpose which he desires. Subscribing witnesses are called to attest the execution of wills, and testify as to the testamentary capacity of the testator, and the circumstances attending the immediate execution of the instrument; but they are not called upon to testify as to the antecedent agencies by which the execution of the paper was secured, even if they had knowledge of them, which they seldom have. . . . The only positive and affirmative proof required is of facts and circumstances from which the undue influence may be reasonably inferred.

32

*Jamison v. Jamison*, 96 Miss. 288, 51 So. 130, 131 (1909)(citing *Blackman v. Edsall*, 68 P. 790, 792 (Colo. 1902). *See also* *Croft v. Alder*, 237 Miss. 713, 115 So. 2d 683 (1959).

## CONCLUSION

¶72.  We find that Bertha failed to overcome the presumption of undue influence by clear and convincing evidence.  Therefore, this matter shall be reversed and remanded for proceedings consistent with this opinion.  Furthermore, as the 2003 will is not valid, the forfeiture clause issue is moot.

¶73. **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER AND DIAZ, P.JJ., CARLSON, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. EASLEY, J., NOT PARTICIPATING.**