ISHEE, J„
 

 for the Court.
 

 ¶ 1. Following a two-day trial, the Chancery Court of Amite County found that the last will and testament of Mack McCorkle Sr. (Mack) was valid.
 
 [1]
 
 Aggrieved by the judgment, Mack’s son, Donald McCorkle (Donald) appeals from the judgment. He presents the following three issues for on appeal:
 

 I.Whether the chancery court erred in finding that Mack possessed the requisite testamentary capacity to execute the will.
 

 II. Whether the chancery court erred in finding that the will was not the product of undue influence.
 

 III. Whether the chancery court erred in refusing to admit the records from the Veteran’s Administration into evidence.
 

 Finding no reversible error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On January 27, 2003, Mack died at the age of eighty. He left a last will and testament that bequeathed his entire estate, except for nominal bequests to his sons, to his daughter and executor of his will, Ruth Beeson (Ruth). In the will, Mack left two dollars to each of his three surviving sons: Donald, Harvey McCorkle (Harvey), and Mack McCorkle Jr. (Mickey).
 
 [2]
 
 Ruth, as the executrix named in the will, filed a petition to probate the will, and Donald responded with a complaint contesting its validity. Donald alleged that Mack did not have the testamentary capacity to execute the will because Mack had been diagnosed with paranoid schizophrenia.
 

 ¶ 3. At the trial of the will contest, Donald did not call any of his own witnesses. Instead, he called Ruth and Harvey to testify adversely. Ruth testified that Donald and Mack had grown apart after Donald tried to have Mack committed for selling timber on Mack’s land. Donald filed a commitment proceeding in 1994, at which two doctors testified that Mack was not suffering from any mental illness, and the court found no basis to Donald’s claim that Mack needed to be committed. Following the hearing, Donald made a number of unsuccessful attempts to get the VA to
 
 *1183
 
 institutionalize Mack. Donald again sought to have his father committed in 1997. At the second commitment hearing, Donald attempted to offer Mack’s VA records, which Donald had obtained without permission, as proof that Mack should be committed. Mack was again examined by two doctors, and the ease was dismissed. Mack then filed a claim of invasion of privacy against Donald, and a jury returned a verdict in favor of Mack and awarded him $175,000.
 

 ¶ 4. Ruth described her relationship with Mack as a “normal daughter-daddy relationship,” and she said that they were not closer than any other parent and child. Mack had given Ruth a general power of attorney because he feared that if anything happened to him, Donald would take control of his assets. She also shared a joint bank account with him and had access to his safe-deposit box. There was no evidence that she was involved in creating any of the powers that Mack granted her or that she used any of them for her benefit. Ruth said she would visit her father approximately every other month. According to Ruth, her father was capable of doing everything on his own, and she did not have to care for him.
 

 ¶ 5. Before executing the will that is the subject of the present appeal, Mack had previously executed a will in which he left all of his possessions to Ruth. According to Ruth, she was not involved in making the first will. She did not know that he had made a will until Mack told her about it afterwards. Mack later called her and said that he wanted to make a new will because he thought the commitment proceeding might be used to void the first will. He told her what he wanted in the will over the phone, and she had the lawyer for whom she worked to draft the will. She then mailed Mack a copy of the will for him to execute.
 

 ¶ 6. John Shivers had known Mack for about two years when Mack died. He said that they had met when Mack had purchased two tractors from Shivers’s family business, Liberty Tractor. According to Shivers, Mack was a nice, helpful, and determined man, who was somewhat eccentric, and who seemed to be in good health. Shivers had heard Mack talk about how he and Donald had been in and out of court, and Shivers said that it seemed like there was a lot of friction between Mack and Donald. Shivers described Mack as being very capable of getting around to places on his own and as being fully capable of making his own decisions.
 

 ¶7. Audrey Lee Reese (“Butch”) had known Mack ever since Butch negotiated an oil and gas lease from him in 1994. Butch said that he knew Mack very well. He never thought that Mack had any mental problems, and Butch testified on behalf of him during the two competency proceedings instituted by Donald. Butch also believed that Mack was in good physical health, and he described how Mack would exercise and do work on Mack’s land. Butch was also aware of the friction that existed between Mack and Donald. Butch was the person who Mack went to when he wanted to execute his will. Mack discussed the will and then signed it in front of Butch, Charles Ray Reese (Charles), and Charles Bert Greene (Bert). Butch said that Mack knew exactly what he was doing and that he completely understood the will.
 

 ¶ 8. Butch’s brother, Charles, corroborated his account of Mack. Charles said that Mack knew who his children were, understood and appreciated the provisions of the will, and was competent on the day that he executed the will. Charles testified that Mack did not “have that much high praise for his sons” and that Mack
 
 *1184
 
 told him that they only deserved two dollars each. Bert, the other subscribing witness to the will, offered testimony similar to that of Butch and Charles. He testified that Mack understood the nature and effect of his actions in executing the will and that there did not appear to be anything wrong with Mack’s mind.
 

 ¶ 9. According to Donald, he was acting in Mack’s best interest. He said that the rift between him and his father arose because Mack wanted to cut timber on land that he had agreed to sell to Donald and his brothers. Donald’s brother, Harvey, testified that, initially, nobody wanted the timber on the land to be cut. However, Harvey also testified that the situation had gotten out of control and that everything has been about greed. Harvey thought that, in hindsight, Mack should have been allowed to do whatever he wanted with the land.
 

 ¶ 10. The chancellor found that Mack did possess the testamentary capacity to execute the disputed will. The chancellor further noted that Mack’s mental condition was sufficient even if it was an error to exclude the VA records. Additionally, the chancellor found that the will was not the product of undue influence. In the event that the ruling on the issue of the confidential relationship was in error, the chancellor found that Ruth had presented sufficient evidence to overcome any presumption of undue influence that arose due to Ruth’s relationship with Mack. It is from this judgment that Donald appeals.
 

 STANDARD OF REVIEW
 

 ¶ 11. Our review of a chancellor’s judgment is limited. This Court reviews the chancellor’s decisions under an abuse of discretion standard.
 
 Townsend v. Townsend,
 
 859 So.2d 370, 372(¶ 7) (Miss.2003) (citing
 
 McNeil v. Hester,
 
 753 So.2d 1057, 1063(¶ 21) (Miss.2000)). This Court will not disturb the findings of a chancellor “unless the chancellor was -manifestly wrong, clearly erroneous, or applied the wrong legal standard.”
 
 Id.
 
 (citing
 
 McNeil,
 
 753 So.2d at 1063(¶ 21)).
 

 DISCUSSION
 

 I. Testamentary Capacity
 

 ¶ 12. Donald first argues that the chancellor erred in finding that Mack possessed the testamentary capacity to execute the will. In determining whether Mack possessed the testamentary capacity to execute a will, the chancellor had to consider three factors: (1) whether the testator had “the ability at the time of the will to understand and appreciate the effects of [his] act”; (2) whether the testator had “the ability at the time of the will to understand the natural objects or persons to receive [his] bounty and their relation to [him]”; and (3) whether the testator was “capable of determining at the time of the will what disposition [he] desired to make of [his] property.”
 
 Holmes-Pickett v. Holmes-Price,
 
 961 So.2d 674, 679(¶ 12) (Miss.2007) (quoting
 
 Smith v. Averill,
 
 722 So.2d 606, 610(¶ 12) (Miss.1998)).
 

 ¶ 13. The burden of proving capacity is as follows:
 

 The proponents of the will meet their burden of proof by the offering and receipt of the will into evidence and the record of probate. The proponents make a prima facie case solely on this proof. The burden then shifts to the contestants to overcome the prima facie case, but the burden of proof remains with the proponents to show by a preponderance of evidence that the testator had capacity.
 

 Id.
 
 at (¶ 13) (citations omitted).
 

 ¶ 14. In the present case, the chancellor found by clear and convincing
 
 *1185
 
 evidence that Mack possessed the testamentary capacity to execute the will.
 
 [3]
 
 The chancellor found that Mack was competent even if it was error to exclude the VA documents indicating that he suffered from paranoid schizophrenia. The chancellor noted that Mack had come before the court in April 1995, and he appeared to be very competent. This was approximately one year before Mack executed the will being challenged and contemporaneous to his execution of an almost identical will that completely disinherited Donald. Furthermore, the chancellor found that it was uncontradicted that, on the day that Mack executed the will: (1) he had the ability to understand and appreciate the effects of his actions; (2) he knew the natural objects of his bounty and the extent of his holdings; and (8) he discussed his dispositions with disinterested third parties.
 

 ¶ 15. We find that the chancellor’s ruling is supported by the evidence and is not the result of manifest error, abuse of discretion, or the application of an erroneous legal standard. We also agree that, even if the chancellor had admitted the VA documents, the weight of the evidence leads to the conclusion that Mack had the capacity to execute the will. Accordingly, we find no error with the ruling that Mack possessed the testamentary capacity to execute the will, and we find that this issue is without merit.
 

 II. Undue Influence
 

 ¶ 16. Next, Donald argues that the chancellor was in error in refusing to find that a confidential relationship existed between Mack and Ruth. Several factors must be considered in determining whether a confidential relationship exists between the parties. Those factors are the following:
 

 (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.
 

 Holmes-Pickett,
 
 961 So.2d at 680(¶ 17) (quoting
 
 Wright v. Roberts,
 
 797 So.2d 992, 998(¶ 18) (Miss.2001)).
 

 ¶ 17. In the present case, Ruth and Mack lived in separate states, and the testimony indicated that she did not take care of him. Ruth said that she and her father had a close relationship, but she described it as a “normal daughter-daddy relationship” and said they were no closer than any other parent and child. Ruth took her father to the hospital only when she was in Amite County. Mack placed Ruth on a joint checking account with him, but there was no evidence that she ever used it for anything other than to pay her father’s bills. She also never opened her father’s safe-deposit box until she did so with Donald, approximately one month after Mack’s death. As for Mack’s health, he had previously suffered a heart attack, and there was testimony that he had been diagnosed with paranoid schizophrenia. However, the testimony also indicated that he was neither physically or mentally weak. As for Mack’s age, he died at the age of eighty and had made the will approximately six-and-one-half years prior to
 
 *1186
 
 his death. Lastly, there did exist between Mack and Ruth a power of attorney; however, there was also no evidence that Ruth had ever used it.
 

 ¶ 18. The chancellor recognized that, based on the seven factors listed above, a confidential relationship could have existed between Ruth and her father. Nevertheless, the chancellor found that Ruth did not occupy a confidential relationship with her father “under the spirit of the law.” The chancellor then stated that, in the event that her ruling was in error, she would address the presumption of undue influence that arises following the finding of a confidential relationship. The chancellor found by clear and convincing evidence that there was no undue influence exerted by Ruth on her father.
 

 ¶ 19. If, from the above-mentioned factors, it is evident that a confidential relationship existed, then there arises a presumption of undue influence.
 
 Holmes-Pickett,
 
 961 So.2d at 680(¶ 18). The burden then shifts to the proponent of the will to show
 
 by
 
 clear and convincing evidence:
 

 (1) Good faith on the part of the grantee/beneficiary;
 

 (2) Grantor’s full knowledge and deliberation of his actions and their consequences; and
 

 (3) Advice of (a) competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator’s interest.
 

 Id.
 
 (quoting
 
 Murray v. Laird,
 
 446 So.2d 575, 578 (Miss.1984)).
 

 ¶ 20. The chancellor noted her concern with the fact that Ruth: (1) held power of attorney for Mack, (2) shared a bank account with him, (3) shared a safe-deposit box with him, and (4) was the person to whom Mack communicated the provisions of his will. However, the chancellor pointed out that there was no evidence Ruth ever used the power of attorney, the bank account — except to pay Mack’s bills — , or the safe-deposit box. Also, the most recent will mirrored the provisions of the will that Mack had executed the previous year, with which Ruth had no dealing. Ruth merely typed the will according to the dictation of the attorney for whom she worked, and then she mailed the will to her father so he could execute it in Mississippi. Additionally, the chancellor found that Ruth never did anything to try to override her father’s wishes.
 

 ¶ 21. Despite the concerns, the chancellor found that Ruth acted in good faith. Previously, the chancellor had found that Mack fully understood and appreciated the nature of his actions and their consequences. As for the third factor, the chancellor noted that while Ruth typed the will, she had no involvement in its execution. Mack had it in his control only, and he sought advice from three disinterested individuals with whom he would regularly consult regarding such matters. Namely, he talked to Butch and Charles, who were in the oil and gas business, and he talked to Bert, who was in real estate.
 

 ¶ 22. Ruth certainly satisfied a few factors that could lead to a finding of a confidential relationship between her and her father. However, the evidence also indicated that despite Mack’s advanced age and prior health problems, he was strong-willed and managed to handle his affairs on his own. After considering the facts of this ease, we find no error with the chancellor’s determination that there did not exist a confidential relationship between Ruth and Mack. Furthermore, we agree with the chancellor that the evidence clearly and convincingly established the fact that Ruth did not exert any undue influence over her father. We find that this issue is without merit.
 

 
 *1187
 
 III. Veteran’s Administration Records
 

 ¶23. Lastly, Donald claims that the chancellor was in error in refusing to admit into evidence the VA records that show that Mack had been diagnosed with paranoid schizophrenia. Donald argues that the records should have been allowed in evidence as exceptions to the hearsay rule.
 

 ¶ 24. The admission or exclusion of evidence is generally within the discretion of the trial court, and such decision will not be reversed absent an abuse of that discretion.
 
 Irby v. Travis,
 
 935 So.2d 884, 905(¶ 56) (Miss.2006) (citing
 
 Miss. Dep’t of Transp. v. Cargile,
 
 847 So.2d 258, 263(¶ 16) (Miss.2003)). Upon review, this Court will only reverse a case based on the admission or exclusion of evidence if the action “results in prejudice and harm or adversely affects a substantial right of a party.”
 
 Blake v. Clein,
 
 903 So.2d 710, 722(¶ 30) (Miss.2005) (quoting
 
 K-Mart Corp. v. Hardy,
 
 735 So.2d 975, 983(¶ 21) (Miss.1999)).
 

 ¶ 25. The basis for the chancellor’s refusal to admit the VA records into evidence was that the records were not properly authenticated. As the chancellor stated in the bench ruling, there had been no testimony from a doctor or from a VA official who could interpret the records and explain to the court what a diagnosis of paranoid schizophrenia carried with it. On appeal, Donald submits a Certification of Official Records from a director of a VA Regional Office, which he offers as authentication of the VA records that he attempted to introduce at trial. He requests that this Court accept this document as a supplement to the trial record. However, this Court may not consider information that is not contained in the record.
 
 Davis v. Christian Bhd. Homes of Jackson, Miss., Inc.,
 
 957 So.2d 390, 398(¶ 15) (Miss.Ct.App. 2007) (citing
 
 Hardy v. Brock,
 
 826 So.2d 71, 76(¶ 26) (Miss.2002)). Not only was the certification document not contained in the appellate record, but it was also not introduced before the chancery court. Accordingly, we decline to consider this new information because the document is not part of the record and was not considered at trial.
 

 ¶ 26. Furthermore, the chancellor stated that she would have found that Mack possessed the testamentary capacity to execute the will even if the VA records had been admitted into evidence. The chancellor considered the fact that Mack had been diagnosed with paranoid schizophrenia and considered it alongside the testimony as to his competency at the time he executed the will, ultimately concluding that Mack possessed the necessary testamentary capacity despite the diagnosis.
 

 ¶ 27. As recognized by the chancellor, the fact that Mack might have been diagnosed with paranoid schizophrenia would not completely prohibit him from executing a will. “Even where a conservatorship is granted for reasons having to do with the testator’s mental instability, we do not now question the proposition that a person under a conser-vatorship may have ‘lucid intervals’ during which he may validly execute a will.”
 
 Mask v. Elrod,
 
 703 So.2d 852, 856(¶ 18) (Miss.1997) (quoting
 
 Gholson v. Peters,
 
 180 Miss. 256, 267, 176 So. 605, 606 (1937)). Therefore, even in the case of a testator with mental problems, a will may still be validly executed. In the present case, Mack’s mental problems had not risen to the level of requiring a conservatorship. All the testimony indicated that he was perfectly competent and understood all of his actions in executing his will. Therefore, we agree with the chancellor’s ruling that, even if she were to consider the VA
 
 *1188
 
 records, Mack possessed the requisite testamentary capacity to execute the will. We find no merit to this issue.
 

 ¶ 28. THE JUDGMENT OF THE CHANCERY COURT OF AMITE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . The chancellor noted that a jury trial for the will contest was waived.
 

 [2]
 

 . At the time of trial, two of Mack's sons, Mickey and James McCorkle, were deceased. He was survived by his sons, Donald and Harvey, and his daughter, Ruth.
 

 [3]
 

 . The chancellor actually found that Ruth met a higher burden than necessary to prove Mack's testamentary capacity. As stated, the proponent of the will is only required to prove the testator’s capacity by a preponderance of the evidence.
 
 See Holmes-Pickett,
 
 961 So.2d at 679(¶ 13).