ROBERTS, J.,
for the Court:
¶ 1. Ruth Colbert appeals the Hinds County Chancery Court’s decision to deny her petition to set aside George William Mace’s will. According to Colbert, Mace lacked the testamentary capacity to execute his will. Colbert also claims that the chancellor should have set aside Mace’s will because it was the product of Patricia Gardner’s undue influence over Mace. Finding no error, we affirm the chancellor’s judgment.
FACTS AND PROCEDURAL HISTORY
¶ 2. Mace never married, but Colbert is his biological daughter. She was born in 1943, but she did not have a close relationship with Mace. She testified that she never lived with him, and she moved to Illinois when she was seven or eight years old. When Colbert was eleven or twelve years old, Mace called her at her home in Illinois. According to Colbert, during that telephone conversation, Mace said that he wanted to “take care of her.” But Colbert testified that to her knowledge, Mace never actually provided for her. The record indicates that Mace and Colbert did not communicate for some time after that.
¶ 3. Approximately forty years later, Mace and Colbert met face-to-face for the first time that Colbert could remember. Colbert testified that Mace acknowledged that she was his daughter when they met in 1994. However, in 1996, Mace did not name Colbert as a beneficiary of the joint will that he executed with his brother, Theodore Roosevelt Mace. Mace appointed Theodore as the executor of his will, and named him as the primary beneficiary. Mace also listed a number of his extended family members as secondary beneficiaries under the 1996 joint will.
¶ 4. In 1999, Mace’s great niece, Gardner, moved into Mace’s home to help both Mace and Theodore. Essentially, Gardner acted as their, caregiver. She also cooked, cleaned, performed household duties, and drove them to their appointments. During 2000, Theodore moved into a nursing home. Gardner continued to live with Mace. In general, Gardner continued to help' Mace with tasks that he was not physically capable of performing by himself. However, Mace continued to pay his own bills, handle his own finances, and manage his business affairs.
¶ 5. On February 1, 2003, Mace revoked his 1996 will. Nine days later, Mace executed a new will. Mace’s 2003 will was somewhat similar to his 1996 will in that he did not list Colbert as a beneficiary; he appointed Theodore as the executor of his will; and he named Theodore as the primary beneficiary of his estate: But in the event that Theodore predeceased Mace, *678 Gardner was appointed as the successor executor of Mace’s 2003 will, and one of the secondary beneficiaries of his estate.[1] Mace also listed other family members along with Gardner as secondary beneficiaries of his 2008 will. However, Mace omitted members of his family who had died since he had executed his 1996 will.
¶ 6. Gardner continued to live with Mace. Theodore died approximately five years before Mace passed away on February 20, 2009. Mace was ninety-seven years old when he died. His will was admitted to probate in May 2009. Three months later, Colbert filed two petitions: (1) a petition to be adjudicated as Mace’s biological daughter and his sole surviving heir,[2] and (2) a petition to contest Mace’s 2008 will. According to Colbert, Mace lacked testamentary capacity to execute the 2003 will. Colbert also claimed that Gardner’s status as the primary beneficiary of Mace’s estate was the product of Gardner’s undue influence over Mace. Colbert requested that the chancellor declare Mace’s 2003 will “null and void” and find that she is the sole beneficiary of Mace’s estate.
¶ 7. The parties went to trial for four days split between February and July 2011. Ultimately, the chancellor found that Mace had the requisite mental capacity to execute his 2003 will, and the 2003 will was valid as a matter of law. The chancellor found that there was a confidential relationship between Mace and Gardner. But the chancellor also held that there were no suspicious circumstances to suggest that Gardner used her confidential relationship with Mace to exert undue influence over him. Consequently, the chancellor denied Colbert’s petition to contest Mace’s will. Colbert appeals.
STANDARD OF REVIEW
¶ 8. “When reviewing a chancellor’s legal findings, particularly involving the interpretation or construction of a will, this Court will apply a de novo standard of review.” In re Last Will & Testament of Carney, 758 So.2d 1017, 1019 (¶ 8) (Miss.2000). With respect to a chancellor’s findings of fact in a will contest, the Mississippi Supreme Court has held that it “will not disturb [the] findings of a chancellor unless the chancellor was manifestly wrong [or] clearly erroneous, or [the chancellor] applied an erroneous legal standard.” Goode v. Village of Woodgreen Homeowners Ass’n, 662 So.2d 1064, 1070-71 (Miss.1995).
ANALYSIS
¶ 9. As a preliminary matter, we note that Gardner did not file a brief in response to Colbert’s appeal. Under the circumstances, we have two options that depend on the record and the quality of Colbert’s brief. If “the record is complicated or of large volume and the case has been thoroughly briefed by the appellant with apt and applicable citation of authority so that the brief makes out an apparent case of error,” we should consider Gardner’s failure to file a brief as a “confession of error” and reverse the chancellor’s judgment. Sullivan v. Sullivan, 942 So.2d 305, 307 (¶ 7) (Miss.Ct.App.2006) (quotation marks omitted). But if “the record can be conveniently examined and such examination reveals a sound and unmistakable basis or ground upon which the judgment may be safely affirmed,” we may affirm the chancellor’s judgment. Id. (quotation marks omitted). The record is not large or complicated. The trial transcript is less than 350 pages long. The court record contains less than sixty pages. And there are relatively few exhibits. *679 Thus, we turn to whether there is a “sound and unmistakable basis” to support the chancellor’s judgment. Id.
I. MENTAL CAPACITY
¶ 10. Colbert argues that Mace “was incapable of managing his own affairs or estate.” To support her claim, Colbert notes Mace’s advanced age and his reb-anee on Gardner to' help him with some of his everyday tasks. According to Colbert, Mace “was not mentally or physically capable of determining [how he wanted to dispose of] his property because of [Gardner’s] exercise of dominion and control by undue influence over [Mace’s] person and estate.” Colbert further claims that Mace “did not have the capability, understanding, or knowledge to appreciate the fact that [Colbert], his daughter[,] was his only heir-at-law and [she] was being excluded [from his 2003 will], as a result of [Gardner’s] dominance, control, and undue influence.” Finally, Colbert notes that Mace had sought medical treatment for dizziness, weakness, “hearing acuity, poor appetite and gastritis, longstanding allergy problems,” and vision problems.
¶ 11. The supreme court has held that a person’s testamentary capacity to execute a will depends on three factors that must all be considered from the perspective of the time the will was executed: (1) whether the testator was able to understand and appreciate the effects of his decision to execute the will; (2) whether the testator was able to “understand the natural objects or persons to receive [his] bounty and their relation to [him]”; and (3) whether the testator was capable of determining how he wanted to dispose of his property. In re Estate of Holmes, 961 So.2d 674, 679 (¶ 12) (Miss.2007). “The proponents of the will meet their burden of proof by the offering and receipt of the will into evidence and the record of probate.” Id. at (¶ 13). “The burden then shifts to the contestants to overcome the prima facie case, but the burden of proof remains with the proponents to show by a preponderance of evidence that the testator had capacity.” Id. at 680 (¶ 13).
¶ 12. Colbert does not claim that Mace’s mental capacity was diminished in and of itself. Nor does she claim that Mace was being treated for dementia'or any other condition that would indicate that his mental capacity was diminished. Instead, she argues that due to Gardner’s undue influence over Mace, he could not have understood the consequénces of his 2003 will. Colbert’s argument is also based on the fact that Mace had sought medical treatment for a number of physical ailments. However, Mace’s physical capacity is not at issue. There is simply no evidence that Mace suffered from anything that negatively impacted his mental state when he executed the 2003 will. Mace’s physician testified by deposition that he never saw any indication that Mace suffered from senility, incoherence, disorientation, or dementia during the time that he executed his 2003 will. As the chancellor noted, a number of Mace’s family and other associates testified that Mace handled his own financial and business affairs, and he was mentally competent at all times. When Mace executed his 2003 will, he had the presence of mind to omit family members who had died after he named them as secondary beneficiaries in his 1996 will. We find that the chancellor acted within his discretion when he declined to find that Mace lacked the necessary testamentary capacity to execute the 2003 will. There is no merit to this issue.
II. UNDUE INFLUENCE
¶ 13. Next, Colbert appeals the chancellor’s decision that Gardner did not unduly influence Mace to name her the beneficiary of his 2003 will. According to Colbert, because the chancellor held that there was a confidential relationship be *680 tween Gardner and Mace, Gardner bore the burden of rebutting the presumption that she unduly influenced Mace to name her the beneficiary of his 2003 will. Colbert is mistaken. In the context of a will contest, “[t]he mere existence of a confidential relationship ... is not in itself sufficient to raise a presumption of undue influence.” In re Estate of Laughter, 28 So.3d 1055, 1064 (¶37) (Miss.2009). One who seeks to set aside a will based on undue influence must also demonstrate
[that] the beneficiary has been actively concerned in some way with the preparation or execution of the will; or [that] the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator; or [that] the beneficiary in the confidential relation was [directly active] in preparing the will or procuring its execution, and [the beneficiary] obtained [a substantial benefit from it].

Id.

¶ 14. Mace had his 2003 will prepared with the law firm Stamps & Stamps in Jackson, Mississippi. Mace had hired that firm in the past. Gardner testified that Mace contacted the firm himself. Mace signed the checks to pay for the attorneys’ fees that he incurred for the preparation of his 2003 will. The chancellor held that there was no evidence to contradict the conclusion that Mace acted alone when he decided to hire Stamps & Stamps to draft his 2003 will.
¶ 15. Additionally, the chancellor held that Gardner did not participate in the procurement or the preparation of Mace’s will. The chancellor noted that Gardner drove Mace to the attorneys’ offices, but Gardner drove Mace to “almost all” of his appointments. Gardner did not accompany Mace when he met with his attorneys. Instead, Gardner remained outside of the attorneys’ offices altogether while Mace conducted his business inside. The chancellor further noted that “there was no evidence or testimony to suggest that Gardner was privy to the contents of [Mace’s 2003 will] prior to its execution.” Laura Kaufman, an officer at Regions Bank, testified that she and a bank teller were asked to witness the moment that Mace signed his will in the presence of a notary public. Kaufman testified that she did not remember Gardner being present at that moment. According to Kaufman, Mace appeared to be “fine.”
¶ 16. The chancellor held that “[although a confidential relationship existed between Gardner and [Mace], there [was] no evidence that Gardner used [that] relationship to unduly influence [Mace].” The chancellor noted the fact that Mace’s 2003 will was similar to his 1996 will in that Mace named a number of his family members as secondary beneficiaries. The chancellor acted within his discretion when he held that there were no suspicious circumstances to suggest that Gardner used her confidential relationship with Mace to unduly influence him so that she could inherit a one-sixth interest in his estate in the event that Theodore predeceased him. As in Colbert’s first issue, our examination of the record reveals a sound and unmistakable basis to affirm the chancellor’s judgment. Accordingly, we find no merit to this issue.
¶ 17. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.

. Specifically, if Theodore predeceased Mace, Gardner would inherit one-sixth "of an undivided interest in [Mace’s] residuary estate."

. Colbert was adjudicated to be Mace's biological daughter on February 8, 2011.