# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01288-COA

IN THE MATTER OF THE ESTATE OF          APPELLANT
CHARLES WALKER, DECEASED:
CRIS MILLER

v.

CHRISTOPHER HALL AND LINDA HALL        APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 10/20/2020 |
| TRIAL JUDGE: | HON. WATOSA MARSHALL SANDERS |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | CHAKA DENISE SMITH |
| ATTORNEY FOR APPELLEES: | BOYD P. ATKINSON |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | REVERSED AND REMANDED - 11/09/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Cris Miller, executrix of the estate of Charles Walker, deceased, filed a petition to set aside a deed that Walker had executed conveying real property to Christopher and Linda Hall.  Miller alleged that the Halls had a confidential relationship with Walker and that the deed was void because it was the product of undue influence.  The Halls conceded they had a confidential relationship with Walker, but they denied that they obtained the deed by undue influence.  Following a trial, the chancellor found in favor of the Halls and denied Miller's petition to set aside the deed.  The chancellor's ruling was based on the deposition testimony of the attorney who drafted the deed, which was admitted into evidence over Miller's

objection.

¶2.     On appeal, Miller argues that the chancellor erred by admitting the attorney's deposition.  Miller also argues that the remaining admissible evidence was insufficient to meet the Halls' burden of proof—i.e., their burden to rebut the presumption of undue influence by clear and convincing evidence.  For the reasons discussed below, we agree that the admission of the deposition over Miller's objection was an abuse of discretion and reversible error.  We reverse and remand the case for a new trial consistent with this opinion.

### FACTS AND PROCEDURAL HISTORY

¶3.     In January 2014, Charles Walker executed a quitclaim deed conveying his home in Pace, Mississippi, to his "caretakers," Christopher and Linda Hall, as joint tenants with rights of survivorship.  Walker reserved a life estate in the property.  The deed stated that it was in consideration for the "love and care that the [Halls] ha[d] provided [Walker] over the years."

¶4.     In 2018, Walker executed a last will and testament that named Cris Miller, Walker's "beloved god-daughter," as his executrix.  The will devised and bequeathed all of Walker's real and personal property to Miller.

¶5.     In 2020, Walker passed away at the age of ninety-one.  Miller filed a petition to probate Walker's will in the Bolivar County Chancery Court.  The court admitted the will to probate and appointed Miller to serve as Walker's executrix.  Miller then filed a petition to set aside the deed from Walker to the Halls.  The petition alleged that the Halls had a confidential relationship with Walker, who was eighty-five years old when the deed was executed, and that the deed was the product of the Halls' undue influence on Walker.

2

¶6. The Halls filed a response denying that the deed was the obtained by undue influence. The response stated that Walker had asked the Halls to take him to the office of attorney Kenneth Thomas. The response further stated that outside the Halls' presence, Thomas "took great care to explain to [Walker] the legal import of a deed that he wanted to sign to reserve a life estate with a remainder to [the Halls]." In addition, the response stated that Thomas called Walker's son, Wilbert Gillespie, who lived in Tennessee. According to the response, Gillespie told Thomas that the Halls "had been a 'God send' to his father because he was unable to physically travel to Pace . . . to look after his father," and "Gillespie was in complete agreement with his father's wishes to deed the subject property to [the Halls]." Thomas subsequently prepared the deed at issue and met Walker in the chancery clerk's office, where the deed was witnessed and notarized by a deputy chancery clerk.

¶7. In July 2020, the Halls took Thomas's deposition at their attorney's office in Cleveland. Thomas testified that the Halls brought Walker to his office on January 30, 2014. Thomas had met Walker while "campaigning"[1] years earlier, but he had not done any legal work for Walker previously. The Halls were not "regular clients" of Thomas's either, although he thought he might have prepared "a will or something like that" for them.[2]

¶8. Consistent with his "customary practice," Thomas asked the Halls to leave the room so that he could speak to Walker in private. Thomas asked Walker about the proposed deed and its effect and whether he was conveying the property of his own free will. Walker told

---

[1] Thomas served as a circuit court judge for sixteen years prior to retiring in 2010.

[2] Linda Hall later testified that Thomas had prepared "some deeds" for them.

3

Thomas that he wanted to give the property to the Halls. Thomas also asked Walker about his health and whether he had a wife or any children. Walker said that he was generally in good health, that his wife had passed away, and that he had one son, Gillespie, who lived in Tennessee. Thomas then had Walker call Gillespie and put him on speakerphone. Walker said that he wanted to convey his property to the Halls but also wanted to continue living there. Thomas explained that Walker could deed the property to the Halls but reserve a life estate, and Walker "was very excited" and "said that was exactly what he wanted." Gillespie was also "pleased" with the idea because he knew that the Halls had been taking care of his father. Gillespie was not in good health and was not able to travel to Pace to care for his father. Thomas understood that Gillespie's death "was somewhat imminent," and Gillespie passed away later that year. After talking to Walker and Gillespie, Thomas was satisfied that Walker was acting of his own free will and understood the effect of a quitclaim deed with a reservation of a life estate. The Halls did not return to the room until after Thomas had finished speaking with Walker and Gillespie.

¶9.    Thomas told Walker to meet him the next day at the chancery clerk's office to sign the deed. Thomas signed the deed at the chancery clerk's office on January 31, 2014, in the presence of a deputy chancery clerk, who witnessed and notarized the deed. Thomas testified that if he had thought that Walker "was under any kind of undue influence, [he] would not have . . . prepared the deed."[3]  At his deposition, Thomas produced his contemporaneous

---

[3] Thomas testified that there had been other times during his career where he perceived that someone was under "pressure" to sign a deed, and "in those instances, [he] just refused to" prepare the deed.

4

notes from his meeting with Walker, which corroborated his deposition testimony. Miller's attorney was present at Thomas's deposition and cross-examined him. The Halls filed a copy of Thomas's deposition in the chancery court on September 28, 2020.

¶10. On October 5, 2020, the case proceeded to a trial on Miller's petition to set aside the quitclaim deed. The Halls stipulated that they had a confidential relationship with Walker at the time he executed the deed, which gave rise to a presumption that the deed was procured by undue influence. *See Mullins v. Ratcliff*, 515 So. 2d 1183, 1192 (Miss. 1987). The Halls also agreed that they bore the burden of rebutting that presumption by clear and convincing evidence. *See id.* at 1193.

¶11. Miller testified that Walker moved in with her in 2017 because he could no longer live by himself. Previously, Walker lived with a woman, Mamie Clark, who was about twenty-five years younger than him. Walker was not married to Clark, though "he called her his wife." Clark had to move out because she could no longer care for herself. After Walker moved into Miller's house, Miller's daughter moved into Walker's house. Miller's daughter was still living in the house at the time of trial and had never paid rent. Miller testified that she had been appointed as Walker's conservator in 2018.

¶12. Miller claimed that Walker told her that the Halls "were trying to take his house" and "had taken him somewhere to sign . . . a blank piece of paper." Miller opined that Walker "really didn't know what he was signing" when he executed the deed to the Halls in 2014. Miller testified that Walker told her that he did not want the Halls to have his house. She said that Walker became very angry at the suggestion that the Halls would get his house.

5

Miller opined that Walker was "easily influenced" by others.

¶13.    However, Miller also testified that Walker "wasn't influenced to" sign the 2018 will in which he left his entire estate to her.  Miller said that the chancellor in Walker's conservatorship case told Walker that he could execute a new will.  Miller further testified that she (Miller) "had to explain everything to Walker" about the new will.

¶14.    Linda Hall testified that she was sixty-nine years old and had known Walker since she was six or seven years old.  Linda grew up in Pace and attended the same church as Walker. She testified that beginning sometime between 2006 and 2008, she helped Walker by taking him to buy groceries and to doctor appointments, picking up his prescription medicines, paying bills, and washing clothes.[4]  After Gillespie died in 2014, Linda became the representative payee for Walker's Social Security benefits.  Linda also checked in on Walker once or twice a day, although she had to check on him less frequently when he had a "girlfriend" living with him.

¶15.    Linda testified that at the time Walker executed the subject deed, he was eighty-five years old and in good health, although he walked slowly and was hard of hearing.  Linda testified that neither Walker nor Miller ever attempted to discuss the quitclaim deed with her or her husband prior to this lawsuit.  Linda testified that if Walker had ever asked her to undo the deed, she would have given him the property back.

¶16.    Linda testified that she took Walker to Thomas's office at Walker's request.[5]  Linda

---

[4] Previously, Linda had also helped care for Walker's elderly mother.

[5] Linda testified that only she and Walker went to Thomas's office.  However, both Thomas and Christopher Hall testified that Christopher was also present.  Christopher

6

thought that someone had recommended Thomas to Gillespie, and she assumed that Gillespie had scheduled Walker's appointment with Thomas. Linda testified that she did not know the purpose of the visit until after she and Walker arrived at Thomas's office. When Walker said that he wanted "to put the house in [Linda's] name," Thomas asked her to leave the room. Walker and Thomas then met in private. After Linda and Walker left Thomas's office, Walker did not tell her what he had decided to do. The next day, she took Walker to the chancery clerk's office, where he signed the subject deed. Linda testified that she did not pay Thomas for his services and assumed that Walker had paid him.

¶17. Christopher Hall also testified. His testimony was generally consistent with Linda's testimony. He also testified that he performed general maintenance and repairs on Walker's house as needed or when requested by Walker or Gillespie.

¶18. After Christopher testified, the Halls' attorney (Mr. Atkinson) stated that he wanted to "file the deposition of Mr. Thomas into evidence" and that the deposition could "either be accepted as is" or they could "read it into the record." Miller's attorney objected that "[t]he foundation ha[d] not been laid as to why Judge Thomas did not appear himself to testify as to what took place in the meeting that day." The following exchange then occurred:

> MR. ATKINSON: I'm sorry. I didn't understand that.
>
> THE COURT: She [(i.e., Miller's attorney)] said that there's been no foundation as to why Judge Thomas cannot appear in person to testify.
>
> MR. ATKINSON: I don't have Judge Thomas here to testify, Your Honor.

---

testified that he went to Thomas's office in a separate vehicle and that he and Linda both left the room when Thomas asked to speak to Walker alone.

7

THE COURT:          That was her question. Why is Judge Thomas not here to testify to this? Why are you seeking to get this deposition admitted? Is he unavailable?

MR. ATKINSON:       Is he what?

THE COURT:          Is he unavailable, sick, out of town?

MR. ATKINSON:       I don't know where he is today. But when I asked -- when this first came up and I talked to Judge Thomas about this, he told me unequivocally, "I'm not going to testify. I will give a deposition." And that's why I deposed him. He said flatly he would not testify.

THE COURT:          All right. Then, that being the case, this Court will accept his deposition.

¶19. The Halls then rested their case. Miller called her sister, Gloria Williams, to testify. Williams, a nursing supervisor at Bolivar Medical Center, testified that after Walker moved in with Miller, she would go to Miller's house to check on minor ailments of Walker's or issues with his medication. Williams testified that on one such occasion, Miller asked Walker if he wanted the Halls to have his house. According to Williams, Walker "said, 'S*** no.' And he got very shaken."

¶20. The chancellor subsequently entered a written opinion and order. Based on Thomas's deposition testimony, the chancellor found that the Halls had rebutted the presumption of undue influence by clear and convincing evidence. Therefore, the chancellor denied Miller's petition to set aside the quitclaim deed.

¶21. Miller appealed. On appeal, she argues that the chancellor erred by admitting Thomas's deposition into evidence. In addition, Miller argues that the remaining admissible evidence was insufficient to meet the Halls' burden to rebut the presumption of undue

8

influence by clear and convincing evidence.

## ANALYSIS

**I.     The admission of Thomas's deposition was an abuse of discretion and reversible error.**

¶22.    We review the admission or exclusion of evidence for an abuse of discretion. *Sewell v. State*, 721 So. 2d 129, 138 (¶50) (Miss. 1998). However, "[t]he discretion of the trial judge must be exercised within the boundaries of the Mississippi Rules of Evidence." *Id.* Therefore, "an abuse of discretion is shown" if "the trial judge acted outside the rules of evidence." *Mabus v. State*, 809 So. 2d 728, 733 (¶24) (Miss. Ct. App. 2001).

¶23.    Rule 32(a)(3) of the Mississippi Rules of Civil Procedure provides that a deposition of a nonparty witness may be used at trial in certain circumstances. However, this Court has recognized that a trial judge's discretion to admit deposition testimony "is not unfettered," and it "is especially not unfettered where the deposition of an absent witness is sought to be introduced pursuant to . . . Rule 32(a)(3)." *Robinson v. Lee*, 821 So. 2d 129, 134 (¶19) (Miss. Ct. App. 2000). Indeed, we are "obligated to find an abuse of discretion" when a deposition is admitted without a showing that it "met any of the 32(a)(3) exceptions." *Id.*; *accord Smith v. City of Gulfport*, 949 So. 2d 844, 848 (¶11) (Miss. Ct. App. 2007).

¶24.    In this case, the chancellor abused her discretion by admitting Thomas's deposition. The deposition testimony was hearsay because it was given while Thomas was not testifying at the trial and was offered to prove the truth of the matter asserted. MRE 801(c). The deposition could have been admitted if the Halls had shown, inter alia, that they had been unable to procure Thomas's attendance at trial by subpoena. M.R.C.P. 32(a)(3)(D); MRE

9

804(a)(5)(A) & (b)(1). However, the Halls made no such showing. Indeed, they did not even have a subpoena issued for Thomas. Rather, they made no effort to procure Thomas's attendance simply because he reportedly told their attorney that he would not testify in court. Thomas's alleged reluctance to testify in court falls far short of satisfying the standards for admitting deposition testimony under Mississippi Rule of Civil Procedure 32(a)(3)(D) and Mississippi Rule of Evidence 804.[6] As stated above, we will find an abuse of discretion when "the trial judge acted outside the rules of evidence." *Mabus*, 809 So. 2d at 733 (¶24). Moreover, we are "obligated to find an abuse of discretion" when, as in this case, a deposition is admitted without any showing that it "met any of the 32(a)(3) exceptions." *Robinson*, 821 So. 2d at 134 (¶19).[7]

¶25. In their brief on appeal, the Halls cite Rule 32(a)(3), but they make no real argument

---

[6] M.R.C.P. 32(a)(3)(D) ("The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds . . . that the party offering the deposition has been unable to procure the attendance of the witness by subpoena . . . ."); MRE 804(a)(5)(A) ("A declarant is considered to be unavailable as a witness if the declarant . . . is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure . . . the declarant's attendance . . . .").

[7] The dissent suggests that the deposition could have been used pursuant to Mississippi Rule of Civil Procedure 32(a)(3)(F), which states that a deposition may be used "for any purpose if the court finds . . . upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be so used." However, the Halls made no prior "application" and gave no "notice" of their intent to use the deposition at trial. Moreover, the chancellor did not find any "exceptional circumstances" or that the deposition should be admitted "in the interest of justice." No "exceptional circumstances" were presented in this case. Rather, the Halls simply failed to subpoena a witness even though the witness's testimony was essential to their case. The Halls' own lack of diligence is not a reason to ignore the rules of evidence or "the importance of presenting the testimony of witnesses orally in open court."

that the deposition was properly admitted under that rule. Rather, they argue that any error in its admission was "harmless" because Miller was able to cross-examine Thomas at his deposition. The Halls cite *Mutual Life Insurance Co. of New York v. Estate of Hall*, 517 So. 2d 521, 537-38 (Miss. 1987), *overruled on other grounds by Gen. Am. Life Ins. Co. v. McCraw*, 963 So. 2d 1111, 1114 (¶9) (Miss. 2007), *opinion withdrawn and appeal dismissed per stipulation*, No. 2004-CA-01417-SCT (Miss. Aug. 9, 2007), which held that the erroneous admission of deposition testimony under Rule 32(a)(3) was harmless. However, the *Mutual Life* opinion did not state that the error was harmless just because the objecting party had been able to question the absent witness at his deposition. *Id.* at 538. Rather, the Court emphasized that the error was harmless because the objecting party "did not inform or indicate to [the] Court any benefit it would have received from [the witness's] presence [at trial], nor [did the objecting party] state how it was prejudiced by the use of the deposition." *Id.*

¶26. In contrast, the error in this case cannot be dismissed as harmless. As noted above, the Halls conceded at the beginning of the trial that they had a confidential relationship with Walker at the time he executed the subject deed. That confidential relationship gave rise to a presumption that the Halls obtained the subject deed through "undue influence." *Mullins*, 515 So. 2d at 1192. The burden then shifted to the Halls to rebut the presumption of undue influence "by clear and convincing evidence." *Id.* at 1193. Moreover, our Supreme Court has held that "the testimony of . . . interested parties is not sufficient to rebut the presumption of undue influence." *In re Estate of Holmes*, 961 So. 2d 674, 681 (¶19) (Miss. 2007). To

11

rebut the presumption, the grantee of the deed must present "substantial evidence, either from the circumstances, or from a totally disinterested witness from which the court can conclude that the transfer instrument represented the true, untampered, genuine interest of the grantor." *Id.* (quoting *Pallatin v. Jones (In re Will of Fankboner)*, 638 So. 2d 493, 495 (Miss. 1994)). In this case, other than the Halls' own testimony, Thomas's deposition was the only evidence that tended to rebut the presumption of undue influence. Therefore, without Thomas's deposition, Miller would have been entitled to a judgment setting aside the subject deed. For that reason, the error in admitting the deposition clearly was not harmless.

## II. The case should be reversed and remanded rather than reversed and rendered.

¶27. For the reasons explained just above, Miller correctly argues that the remaining admissible evidence was insufficient to meet the Halls' burden of proof. Therefore, at minimum, the judgment of the chancery court must be reversed because of the error in admitting the deposition. The remaining issue is whether we must go a step further and render a judgment in favor of Miller because the evidence that was properly admitted at trial is insufficient to support a judgment in favor of the Halls. The precedents relevant to that issue do not provide a clear or easy answer.

### A. *Witherspoon v. State ex rel. West*

¶28. Our Supreme Court addressed the issue in *Witherspoon v. State ex rel. West*, 138 Miss. 310, 103 So. 134 (1925), a quo warranto action to determine the lawful holder of the office of levee commissioner. In *Witherspoon*, the Supreme Court held that the trial court erred by admitting certain evidence that was necessary to support the trial court's judgment

in favor of the relator. *Id.* at 327, 103 So. at 137, 139. However, the Supreme Court held that it would not reverse and render a judgment against the relator, explaining:

> The record simply presents a case wherein a fact necessary to support the judgment rendered was proven or made to appear by incompetent evidence, and in such a case the Supreme Court on appeal thereto should not decide the case as if no evidence of the fact had been introduced, but should remand the case for a new trial so that the fact may be made to appear by competent evidence. This, in so far as we are aware, is the universal rule . . . .

*Id.* at 327, 103 So. at 139; *see also Gavin v. State*, 785 So. 2d 1088, 1095 (¶28) (Miss. Ct. App. 2001) ("Even when the *only* evidence on an issue has been declared inadmissible, the proper procedure is to remand." (citing *Witherspoon*)).

¶29. Similarly, in *Tapp v. State*, 347 So. 2d 974 (Miss. 1977), the Supreme Court held that the trial judge erred by allowing the defendant's wife to testify over his objection and that "[w]ithout the wife's testimony" the evidence presented at trial "would not sustain a conviction." *Id.* at 977. But the Court held that "since [the wife's] testimony [was] incompetent, the case [would] be reversed and remanded for a new trial upon such other evidence as the State [might] be able to present." *Id.* This Court took the same approach more recently, holding that "the proper procedure is to reverse and remand" for a new trial even if after excluding evidence that was improperly admitted at the first trial, "there arguably remains no evidence, or insufficient evidence, to support [the] convictions." *McClung v. State*, 294 So. 3d 1216, 1231 n.17 (Miss. Ct. App. 2019) (citing *Witherspoon*).

¶30. In addition, in *Campbell v. State*, 798 So. 2d 524 (Miss. 2001), the Supreme Court held that the trial court improperly admitted the defendant's statement and certain physical evidence and that the remaining "admissible evidence offered at trial [was] insufficient to

13

sustain the conviction." *Id.* at 530 (¶22). Nonetheless, the Court held that the case would

be "reversed and remanded for a new trial consistent with [the Court's] opinion." *Id.*[8]

### B.     *Cleveland v. Hamil*

¶31.     In another case in which a trial court erred by admitting certain evidence and the

remaining properly admitted evidence was insufficient to support the jury's verdict in favor

of the plaintiff, our Supreme Court held that the proper result was to reverse and render a

judgment in favor of the defendants. *Cleveland v. Hamil*, 119 So. 3d 1020, 1023-24 (¶¶14-

15) (Miss. 2013). *Cleveland* was a medical malpractice/wrongful death case in which a

patient (Hamil) had surgery to repair an ulcer, was discharged from the hospital, and later

died of complications from a second ulcer. *Id.* at 1021-22 (¶¶2-3). The plaintiff alleged that

Hamil's death was caused by the malpractice by a gastroenterologist (Dr. Smith-Vaniz) and

---

[8] With the exception of *Witherspoon*, the cases discussed above are all criminal cases. In federal court, it is clear that this issue is treated differently in criminal cases than in civil cases. As discussed *infra*, federal civil cases are governed by *Weisgram v. Marley Co.*, 528 U.S. 440 (2000), which holds that a federal appellate court has the "authority" to disregard erroneously admitted evidence and reverse and render a final judgment in this situation but also has the "discretion" to reverse and remand the case to the trial court. *Id.* at 443, 454, 456. In federal criminal cases, in contrast, a federal appellate court will not render a judgment of acquittal if the evidence admitted at the first trial, including improperly admitted evidence, was sufficient evidence to support a guilty verdict. *See, e.g.*, *United States v. Santiago-Gonzalez*, 825 F.3d 41, 46-47 (1st Cir. 2016); *see also Lockhart v. Nelson*, 488 U.S. 33, 39-42 (1988) (holding that a retrial does not violate the Double Jeopardy Clause in that scenario). We acknowledge that there may be "good reasons to distinguish between criminal and civil cases in this respect." *Lightning Lube Inc. v. Witco Corp.*, 4 F.3d 1153, 1200 (3d Cir. 1993). "The questions of what the [Double Jeopardy Clause] will allow [in a criminal case] and what a prudent . . . rule should be in a civil case are distinct." *Id.* Nonetheless, the Mississippi criminal cases discussed above in the text are worth noting because some of them follow *Witherspoon*, a civil case, and because neither this Court nor the Mississippi Supreme Court has expressly stated that this issue should be analyzed differently in civil cases.

14

a cardiovascular surgeon (Dr. Cleveland). *Id.* Prior to trial, the plaintiff's expert "opined that Hamil's doctors deviated from the standard of care by failing to prescribe anti-ulcer medication at Hamil's discharge and allowing the second ulcer to develop post-discharge." *Id.* at 1022 (¶3). At trial, however, the plaintiff's expert admitted that he had been misinformed—the doctors had, in fact, prescribed such medication. *Id.* at (¶4). The plaintiff's expert then proceeded to offer "a new theory of the doctors' malpractice." *Id.* He testified over objection that the second ulcer was already developing prior to Hamil's initial discharge from the hospital and that the defendants breached the standard of care by failing to discover it prior to discharge. *Id.* "The plaintiff presented no additional expert testimony." *Id.*

¶32. On appeal, this Court reversed as to both doctors. *Id.* at (¶6). We first held that the plaintiff's expert was unqualified to render an opinion regarding the standard of care for a gastroenterologist. Therefore, we reversed and rendered a final judgment in favor of Dr. Smith-Vaniz because the plaintiff had failed to present qualified expert testimony against him and failed to present a prima facie case against him. *Id.* at 1022-23 (¶¶6, 8). In addition, we held that the trial court erred by overruling the defendants' objection to the plaintiff's expert's previously undisclosed opinions and new theory of malpractice. *Id.* at 1022 (¶7). Therefore, we also reversed the judgment against Dr. Cleveland. *Id.* However, with respect to Dr. Cleveland, we held that the proper remedy for the evidentiary error was to reverse and remand for a new trial. *Id.* at 1023 (¶8).

¶33. The Supreme Court subsequently granted certiorari. *Id.* at (¶9). The Supreme Court

stated that this Court properly rendered a judgment in favor of Dr. Smith-Vaniz because the plaintiff had "failed to produce a qualified expert" to testify against him, which is essential in a medical malpractice case. *Id.* at (¶¶11-12). However, the Supreme Court held that this Court erred by not rendering a final judgment in favor of Dr. Cleveland as well. *Id.* at (¶13). The Supreme Court reasoned that if "the trial judge [had] excluded [the expert's new and undisclosed opinions]—as he should have—the plaintiff would have been without any expert testimony to establish that Dr. Cleveland breached the standard of care." *Id.* at 1023-24 (¶13). The Supreme Court stated that this Court had erred by relying on cases that did not involve "medical negligence." *Id.* at 1024 (¶15) & n.16. The Supreme Court explained that "[m]edical negligence cases are different from cases that do not call into question the standard of care of a medical provider." *Id.* at (¶14). The Supreme Court stated that "expert testimony may be helpful in non-medical negligence cases," but "it is not required." *Id.* In contrast, in a medical malpractice case, "the failure to produce a competent medical expert prohibits the plaintiff from bringing the case to trial." *Id.* The Supreme Court concluded its analysis of this issue by stating,

> To be clear, a plaintiff may not use inadmissible evidence to establish the standard of care, or that a medical provider failed to comply with that standard of care. Here, the plaintiff's only evidence of Dr. Cleveland's standard of care or breach thereof was inadmissible. Accordingly, it is clear that Dr. Cleveland was entitled to judgment notwithstanding the verdict.

*Id.* at (¶15).

¶34. Thus, most of the *Cleveland* opinion suggests that its holding is specific to medical malpractice cases in which expert testimony regarding the standard of care is admitted in

16

error. However, *Cleveland* also stated:

> Indeed, in every kind of case, a judgment notwithstanding the verdict is generally appropriate where the plaintiff has failed to produce sufficient admissible evidence to establish a prima facie case, and the fact that a trial judge erroneously allows inadmissible evidence into the record—whether expert testimony or otherwise—does not abrogate that rule.

*Id.* at (¶14) (footnote omitted).[9] This statement obviously is much broader and less qualified than the rest of the Supreme Court's opinion. Neither the Supreme Court nor this Court has applied *Cleveland*'s holding in any subsequent cases.

### C. *H & E Equipment Services LLC v. Floyd*

¶35. In *H & E Equipment Services LLC v. Floyd*, 959 So. 2d 578 (Miss. Ct. App. 2007), a jury returned a verdict in favor of the plaintiff on its breach of contract claim and awarded damages in the amount of $45,000. *Id.* at 580 (¶7). However, the trial court subsequently granted the defendant's motion for judgment notwithstanding the verdict (JNOV) after concluding that the invoices that were the plaintiff's sole evidence of damages were hearsay and should not have been admitted at trial. *Id.* 580-81 (¶¶7, 9). On appeal, the plaintiff argued, inter alia, that even if "the invoices were inadmissible, the trial court erred in excluding the erroneously admitted evidence when considering whether to grant [the defendant's] motion for [JNOV]." *Id.* at 581 (¶9).

---

[9] In a footnote following the phrase "sufficient admissible evidence to establish a prima facie case," the Court cited three cases. *Id.* at n.15 (citing *3M Co. v. Johnson*, 895 So. 2d 151, 167 (Miss. 2005); *Wilson v. Gen. Motors Acceptance Corp.*, 883 So. 2d 56, 63 (Miss. 2004); *Harrison v. McMillan*, 828 So. 2d 756, 763 (Miss. 2002)). However, none of those three cases addressed the question whether an appellate court should consider improperly admitted evidence when evaluating the sufficiency of the evidence or when deciding whether to reverse and render a judgment against the appellee.

17

¶36. On appeal, this Court held that the trial court did not err by granting the motion for JNOV. *Id.* at 583 (¶15). Our holding relied in large part on *Weisgram v. Marley Co.*, 528 U.S. 440, 443 (2000), "where the United States Supreme Court addressed whether federal trial and appellate courts had the authority to disregard improperly admitted evidence and enter judgment as a matter of law in favor of the jury verdict loser." *H & E Equip.*, 959 So. 2d at 582 (¶14). We noted that in *Weisgram* the United States Supreme Court affirmed the decision of a court of appeals "to remove erroneously admitted evidence and enter judgment as a matter of law based on the insufficiency of the remaining properly admitted evidence." *Id.* at 582 (¶14) (citing *Weisgram*, 528 U.S. at 457). We further noted that *Weisgram* relied in part on the language of "'Rule 50(a)(1) [of the Federal Rules of Civil Procedure], which states that in ruling on a motion for judgment as a matter of law, the court is to inquire whether there is any 'legally sufficient evidentiary basis' for a reasonable jury' to find as it did." *Id.* (quoting *Weisgram*, 528 U.S. at 453 (quoting Fed. R. Civ. P. 50(a)(1))). The *Weisgram* Court reasoned that "inadmissible evidence contributes nothing to a 'legally sufficient evidentiary basis.'" *Id.* (brackets omitted) (quoting *Weisgram*, 528 U.S. at 454 (quoting Fed. R. Civ. P. 50(a)(1))). This Court noted that while Rule 50 of the Mississippi Rules of Civil Procedure "is worded differently than the federal rule," it has also been interpreted to require the court "to consider whether there is a legally sufficient evidentiary basis to support the verdict of the jury." *Id.* at 582-83 (¶15) (citing *White v. Stewman*, 932 So. 2d 27, 36 (¶25) (Miss. 2006)). Finally, we held that "[b]ecause inadmissible evidence cannot contribute to a 'legally sufficient evidentiary basis,' . . . the trial court . . . did not err

18

in removing erroneously admitted evidence when considering whether to grant [the defendant's] motion for [JNOV]." *Id.* In the years since it was decided, *H & E Equipment* has not been cited on this issue.[10]

¶37. It is important to note that in *Weisgram*, the United States Supreme Court did not hold that a court *must* reverse and render a final judgment when the remaining properly admitted evidence is insufficient to support a judgment in favor of the verdict winner. Rather, the Supreme Court held that an appellate court "has *authority* to render the final decision"—i.e., the appellate court has "*discretion*" to *either* reverse and render a final judgment *or* reverse and remand the case to the trial court. *Weisgram*, 528 U.S. at 443, 454, 456 (emphasis added). The Supreme Court explained that "the appellate court may appropriately" render a final judgment if it "concludes that further proceedings are unwarranted because the loser on appeal has had a full and fair opportunity to present the case." *Id.* at 444. But if the appellate court "determines that the [trial] court is better positioned to decide whether a new trial, rather than judgment for defendant, should be ordered, the [appellate] court . . . should return the case to the trial court for such an assessment." *Id.*

### D. This Case

¶38. The precedents discussed above point in different directions in this case. Under *Witherspoon* and more recent criminal cases from both our Supreme Court and this Court, we should reverse and "remand the case for a new trial" to allow the Halls an opportunity to meet their burden of proof "by competent evidence." *Witherspoon*, 138 Miss. at 327, 103

---

[10] It has been cited by a court only once regarding an unrelated issue. *See Patton Med. of Gulf Coast Inc. v. Relle*, 269 So. 3d 266, 283-84 (¶68) (Miss. Ct. App. 2018).

So. at 139. However, *Cleveland* suggests that it "is generally appropriate" to reverse and render a final judgment when "the plaintiff has failed to produce sufficient admissible evidence to establish [its] case." *Cleveland*, 119 So. 3d at 1024 (¶14). Finally, *Weisgram*, which this Court followed in *H & E Equipment*, holds that although we have the authority to render a final judgment, we also have the authority to remand the case to the trial court.

¶39. Having considered all relevant precedents, we conclude that it is appropriate to remand this case for a new trial. To begin with, we note that the specific issue before the Court in *Cleveland* was whether a medical malpractice plaintiff should get a second bite at the apple despite having proceeded to trial without admissible expert testimony, and the Supreme Court's opinion primarily relied on considerations specific to medical malpractice cases. *Id.* at 1023-24 (¶¶10-15). Accordingly, *Cleveland*'s one broader comment about "every kind of case" and other types of evidence (*id.* at 1024 (¶14)) was arguably dicta.[11]

¶40. But even if we accept *Cleveland*'s broadest statement as on-point and binding, it was still qualified: the Court stated that "a judgment notwithstanding the verdict is *generally appropriate*" when the evidence properly admitted at trial is insufficient to sustain a judgment in favor of the plaintiff. *Cleveland*, 119 So. 3d at 1024 (¶14) (emphasis added). The statement that JNOV is "generally appropriate" in this scenario necessarily indicates that it is not *always* appropriate and that there will be cases in which it is not appropriate.

¶41. This case is distinguishable from *Cleveland* in significant respects. A medical

---

[11] *See, e.g.*, *C.W. v. Lamar County*, 250 So. 3d 1248, 1254 (¶19) (Miss. 2018) ("It is axiomatic that statements which are unnecessary to a court's ruling are dicta."); *Honeycutt v. Coleman*, 120 So. 3d 358, 363 (¶14) (Miss. 2013) (holding that language addressing an issue that "was not before the Court" was "dicta").

malpractice plaintiff must designate his experts and disclose the substance of their opinions prior to trial and is limited at trial to those designated experts and their disclosed opinions. Therefore, if the plaintiff proceeds to trial and relies solely on an expert who is not qualified to testify regarding the standard of care for a given defendant, his claim fails as a matter of law. *Id.* at 1023 (¶12). Likewise, if the plaintiff proceeds to trial and relies solely on previously undisclosed expert opinions, his claim fails as a matter of law. *Id.* at 1023-24 (¶13). In general, it will be too late at trial for the plaintiff to fix his case with new experts or new opinions.

¶42. In this case, in contrast, the Halls might have been able to prove their case even if the chancellor had ruled correctly and sustained the objection to the Thomas deposition. If the objection had been sustained, the Halls could have requested a continuance to subpoena Thomas, and Thomas, a retired circuit judge, presumably would have obeyed a duly issued subpoena. Moreover, if for any reason Thomas did not comply with a subpoena, the Halls then could have laid a proper foundation to admit the deposition under Mississippi Rule of Civil Procedure 32(a)(3)(D)[12] or on some other basis. In short, although the judgment must be reversed due to the erroneous evidentiary ruling, that error should not also prevent the Halls from proving their case with admissible evidence. Therefore, under "the universal rule" stated in *Witherspoon*, we reverse due to the evidentiary error but "remand the case for a new trial so that" the Halls have the opportunity to meet their burden of proof "by

---

[12] M.R.C.P. 32(a)(3)(D) (stating that the deposition of a nonparty witness "may be used by any party for any purpose if the court finds . . . that the party offering the deposition has been unable to procure the attendance of the witness by subpoena").

21

competent evidence." *Witherspoon*, 138 Miss. at 327, 103 So. at 139.

## CONCLUSION

¶43. The admission of the Thomas deposition over Miller's objection was an abuse of discretion and a reversible error. Therefore, the case is reversed and remanded for a new trial consistent with this opinion.

¶44. **REVERSED AND REMANDED.**

**BARNES, C.J., WESTBROOKS, LAWRENCE AND SMITH, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J.; McDONALD, J., JOINS IN PART. GREENLEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McCARTY, J.; McDONALD, J., JOINS IN PART.**

**EMFINGER, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶45. I agree with the majority's analysis under Part I that the chancery court's admission of Thomas's deposition was an abuse of discretion and reversible error. However, I respectfully disagree with the majority that this case should be remanded for a new trial. As noted by the majority, after the exclusion of the wrongfully admitted deposition, the evidence at trial was legally insufficient to support that chancellor's decision. Based upon our precedents in civil cases, I would render a final judgment in favor of Miller.

¶46. To support its decision to remand this case, the majority relies upon *Witherspoon*,[13] a civil case decided in 1925 prior to the adoption of the Mississippi Rules of Civil Procedure, and Mississippi criminal cases that were reversed and remanded after the exclusion of

---

[13] *Witherspoon v. State ex rel. West*, 138 Miss. 310, 103 So. 134 (1925).

evidence on appeal. Although the majority acknowledges there are federal cases that cite good reasons to distinguish between criminal and civil cases in this regard, the majority suggests that we have no Mississippi Supreme Court case that states the issue should be treated differently in a civil case.

¶47. While that may be true, we do have more recent civil cases, decided after the adoption of the Mississippi Rules of Civil Procedure, that require this court to render a decision in favor of the Appellant herein. As noted by the majority, in *Cleveland*, the Mississippi Supreme Court reversed and rendered a verdict in favor of the defendants after evidence essential to the plaintiff's case was ruled to be inadmissible on appeal. *Cleveland v. Hamil*, 119 So. 3d 1020, 1024 (¶16) (Miss. 2013). In *H & E Equipment Services LLC v. Floyd*, 959 So. 2d 578, 582 (¶12) (Miss. Ct. App. 2007), this Court held that "[i]f, after viewing the evidence in [the light most favorable to the non-movant], we conclude that reasonable men could only have found in favor of the movant, we **must** reverse and render." (Emphasis added). Further, in *River Region Medical Corp. v. Patterson*, 975 So. 2d 205, 207 (¶7) (Miss. 2007) (quoting *Twin Cnty. Elec. Power Ass'n v. McKenzie*, 823 So. 2d 464,468 (¶13) (Miss.2002)), the Mississippi Supreme Court stated, "If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are **required** to reverse and render." (Emphasis added).

¶48. In light of precedent wherein this Court and the Mississippi Supreme Court have used the words "must" and "required" in reference to reversing and rendering a judgment under these circumstances, I would reverse and render in the case at hand. Therefore, I concur with

23

the majority that the admission of the deposition was error and that without the deposition, there was insufficient evidence to overcome the presumption of undue influence by the Halls. While I concur that the chancellor's decision must be reversed, I respectfully dissent from the portion of the majority's disposition to remand this case for a new trial and would instead render a verdict in favor of the Appellant.

**CARLTON, P.J., JOINS THIS OPINION. McDONALD, J., JOINS THIS OPINION IN PART.**

**GREENLEE, J., DISSENTING:**

¶49.    I believe that the chancellor did not err by allowing Thomas's deposition to be introduced at trial and that the Halls rebutted the presumption of undue influence by clear and convincing evidence.  Therefore, I respectfully dissent.

¶50.    "The admission of deposition testimony is within the sound discretion of the trial court." *Smith v. City of Gulfport*, 949 So. 2d 844, 848 (¶11) (Miss. Ct. App. 2007) (citing *Robinson v. Lee*, 821 So. 2d 129, 133 (¶16) (Miss. Ct. App. 2000)).  However, when the deposition of an absent witness is sought to be introduced pursuant to Mississippi Rule of Civil Procedure 32(a)(3), "[t]he party offering the deposition must show that it fits into one of the stated exceptions." *Id*.

¶51.    Mississippi Rule of Civil Procedure 32(a)(3) states:

> The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: (A) that the witness is dead; or (B) that the witness is at a greater distance than one hundred miles from the place of trial or hearing, or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; or (C) that the witness is unable to attend or testify because of age, illness, infirmity, or imprisonment; or (D) that the party offering the deposition has been unable to

24

procure the attendance of the witness by subpoena; or (E) that the witness is a medical doctor or (F) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be so used.

M.R.C.P. 32(a)(3).

¶52.    The majority finds that none of the exceptions set forth in Rule 32(a)(3) were successfully proved.  However, subsection (F) states that the deposition of a witness may be used if the court finds "upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be so used."  M.R.C.P. 32(a)(3)(F).

¶53.    In *Smith*, 949 So. 2d at 847 (¶5), residents filed a complaint against the city alleging that the city's failure to properly maintain a drainage ditch caused their property to flood. When the matter came to trial, the residents' sole expert witness concerning the source of flooding was not available to testify because he was a defendant in a federal trial taking place simultaneously. *Id*. at 848 (¶9).  The residents offered the expert's deposition in lieu of his live testimony, and the city moved to exclude the deposition on the ground that the city did not have notice that the deposition was taken for trial purposes. *Id*.  The court excluded the deposition as not complying with Rule 32. *Id*. at (¶10).  On appeal, the residents argued that the court "erred by interpreting Rule 32(a)(3) to require . . . proof, other than counsel telling the court that the witness was unavailable, was needed." *Id*. at 849 (¶14).  The residents also argued that "proper 'application and notice' was given and such exceptional circumstances

existed to necessitate the use of [the expert's] deposition." *Id*. This Court affirmed the court's decision to exclude the deposition, noting that the residents' attorney did not ask for the trial to be rescheduled and that the record did not establish that any of the Rule 32(a)(3) exceptions had been met. *Id*. at 849 (¶¶14, 16).

¶54. While it is unclear what exactly constitutes "application and notice," the Halls filed a notice of their intention to depose Thomas in July 2020, and Miller's attorney was present at the deposition. The hearing on the motion to set aside the quitclaim deed was subsequently held in October 2020. At the hearing, Miller's counsel did not object based on a lack of application and notice. Rather, counsel objected claiming that there had been no foundation laid as to *why* Thomas did not appear in person to testify. Unlike *Smith* where the witness was unavailable due to a scheduling conflict, the Halls' counsel responded that Thomas had told him unequivocally that he would not testify but that he would give a deposition. Counsel represented to the court, "And that's why I deposed him. He said flatly he would not testify." Accordingly, I do not believe that the chancellor erred by admitting—in the face of exceptional circumstances and in the interest of justice—Thomas's deposition.

¶55. Additionally, the majority finds that without Thomas's deposition, the Halls could not rebut the presumption of undue influence by clear and convincing evidence. For the reasons discussed, I believe that the chancellor's decision to admit the deposition was not an abuse of discretion. Further, I believe the Halls rebutted the presumption of undue influence.

¶56. The chancellor found good faith on the part of the beneficiaries. Specifically, the

26

chancellor stated:

> According to [Thomas], the preparer of the deed . . . the Respondents came in with the decedent on January 30, 2014 to discuss the conveyance. After [Thomas] learned that the decedent wanted to convey his property to the Respondents he asked the Respondents to leave the room so that he could question the decedent privately. While [doing so, Thomas] ascertained that the decedent was of sound mind through a serious of questions about his address, his late wife, and his child. [Thomas] was able to contact the son, Wilbert Gillespie, on the phone in the private meeting. Mr. Gillespie along with the decedent expressed to [Thomas] that they wanted the Respondents to have the property because of the love, care, and support that the Respondents bestowed upon the decedent. The care included assistance with finances and assistance with his personal property. Linda Hall further testified at trial to buying groceries for the decedent on a consistent basis, assisting him with managing his bills, and getting him to the doctor. She testified that the care began around 2006 and continued until 2015 when the decedent moved in with his girlfriend. In 2017 he moved in with Cris Miller and the care stopped completely. Linda Hall was never compensated for her care of decedent and she did not testify to requesting payment for her services.
>
> Additionally the decedent communicated with [Thomas] that he wanted to live at his residence until he departed this life. Accordingly, [Thomas] reserved a life interest in the property to the decedent for the remainder of his life. After [Thomas] was satisfied that he was executing a proper deed, he called the Respondents back in the room to discuss signing the deed the next day. On the following day, [Thomas] had the decedent sign the deed in the Chancery Clerk's office of Bolivar County. His signature was notarized by Deputy Clerk Delois Green.
>
> It is clear from the testimony of [Thomas] and Linda Hall that Mrs. Hall took good care of the decedent for years. It is also clear from Mrs. Hall's testimony that she never received any compensation for sacrificing her time and energy daily to care for the decedent as if he were her own family member. She also took the decedent to a reputable attorney and did not sit in on the proceedings as the decedent discussed the conveyance with the attorney.

¶57. The chancellor further found that the decedent had full knowledge and deliberation of the consequences of his actions and that he gave independent consent and action based on all the surrounding facts and circumstances. The chancellor stated:

27

It is clear through [Thomas's] testimony that a thorough investigation was conducted with the decedent before the deed was drafted and executed. Also, the decedent's foresight to reserve a life estate in himself coupled with the decedent's lack of action to set aside the deed in his lifetime lead the court to believe he was aware of his actions and wanted them to be permanent. The decedent also gave his signature in front of multiple witnesses in the Bolivar County Chancery Clerk's office who are duty bound not to notarize the signature of a person with diminished capacity.

¶58. I agree with the chancellor's ruling that the Halls rebutted the presumption of undue influence. Because I would affirm the judgment of the chancery court, I dissent.

**McCARTY, J., JOINS THIS OPINION. McDONALD, J., JOINS THIS OPINION IN PART.**